**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
NEWARK DIVISION**

|  |  |
|---|---|
| UNITED STATES TECHNOLOGIES, INC., & UST ALDETEC HOLDING COMPANY, LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, <br><br> *Defendant.* | Civil Action No. _____ <br><br> ELECTRONICALLY FILED |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs United States Technologies, Inc. and UST Aldetec Holding Company, LLC (collectively "UST Aldetec"), by and through their undersigned attorneys, hereby file this Complaint and Demand for Jury Trial against Defendant Travelers Casualty and Surety Company of America ("Travelers") and in support thereof, aver as follows:

**<u>NATURE OF THE CASE</u>**

1. UST Aldetec is a consolidated group of private companies that provides services and products to defense and commercial customers. Its businesses have focuses in RF detection, frequency conversion, amplification, power management, and repair/re-engineering of subsystems for obsolescence mitigation and extending system lifetime.

2. UST Aldetec purchased insurance from Travelers under a "Wrap+ Liability Policy" No. 106639043, for the policy period December 1, 2017 to December 1, 2018 (the "Travelers Policy"). A true and correct copy of the Travelers Policy is attached hereto as **<u>Exhibit A</u>**.

3.      The Travelers Policy's Private Company Directors and Officers Liability Coverage Part ("D&O Coverage Part") provides coverage to UST Aldetec for "Loss" resulting from "Claims" first made against UST Aldetec and/or UST Aldetec's "Insured Persons" during the Travelers Policy's policy period, "for Wrongful Acts." The Travelers Policy further provides that Travelers "will have the right and duty to defend any Claim covered by [the D&O Coverage Part], even if the allegations are groundless, false of fraudulent…."

4.      UST Aldetec brings this action seeking a judgment: (1) that Travelers is obligated to defend and indemnify UST Aldetec in connection with a Claim initiated by certain search and seizure warrants executed on UST Aldetec on or about September 26, 2018; and (2) for damages for breach of contract for Travelers' refusal to defend UST Aldetec against the Claim and pay 100% of its "Defense Expenses" as required by the Travelers Policy, along with pre-judgment and post-judgment interest, attorneys' fees, and costs, and such other further relief as the Court may deem just and proper.

## THE PARTIES

5.      United States Technologies, Inc. is a New Jersey Corporation with a principal place of business at 17-01 Pollit Drive, Fair Lawn, NJ 07410.

6.      UST Aldetec Holding Company, LLC is a Delaware limited liability corporation with a principal place of business at 17-01 Pollit Drive, Fair Lawn, NJ 07410. No member of UST Aldetec Holding Company, LLC is a citizen of Connecticut.

7.      Travelers Casualty and Surety Company of America is an insurance company incorporated in the State of Connecticut with its principal place of business at One Tower Square Hartford, CT 06183. Travelers is licensed to do business in the State of New Jersey, has written insurance policies covering risks for New Jersey citizens, including UST Aldetec, and otherwise transacts substantial business in the State of New Jersey.

## JURISDICTION AND VENUE

8.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. This Court has the power to declare the parties' rights and obligations pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

9.      The Court has jurisdiction over Travelers pursuant to N.J. CT. R. 4:4-4 because Travelers is licensed to do business in the State of New Jersey and is subject to personal service in this state. Moreover, Travelers issued the Travelers Policy to UST Aldetec at its New Jersey place of business, and thereby insured the covered risks of New Jersey citizens.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(2) because "a substantial part of the events or omissions giving rise to the claim occurred" in this district, including, *inter alia*, because it is the district encompassing the UST Aldetec premises, property, and individuals on which the search and seizure warrants at issue were executed.

## FACTUAL BACKGROUND

## THE TRAVELERS POLICY

11.     UST Aldetec paid all required insurance premiums for the Travelers Policy.

12.     UST Aldetec has satisfied all terms and conditions of the Travelers Policy.

13.     The Travelers Policy was in full force and effect at all pertinent times.

14.     The Travelers Policy's D&O Coverage Part states that Travelers "will pay on behalf of …"

> B. the Insured Organization, Loss for Wrongful Acts which the
> Insured Organization pays to or on behalf of the Insured Persons as
> indemnification; and
>
> C. the Insured Organization, Loss for Wrongful Acts,
> resulting from any Claim first made during the Policy Period….

15.     The Travelers Policy's D&O Coverage Part defines "Insured Organization" to include "the Named Insured, [and] any Subsidiary…."

16.     The Travelers Policy's Liability Coverage Terms and Conditions form defines "Named Insured" to mean "any entity named in ITEM 1 of the Declarations." ITEM 1 of the Declarations in turn designates UST Aldetec Holding Company, LLC as the Named Insured.

17.     The Travelers Policy's D&O Coverage Part defines "Subsidiary" to include "any corporation, partnership, limited liability company or other entity organizaed under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the Named Insured owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent[.]" United States Technologies, Inc. is a "Subsidiary" of UST Aldetec Holding Company, LLC within the Travelers Policy's definitions of "Subsidiary."

18.     The Travelers Policy's D&O Coverage Part defines "Insured Person" to include "any natural person who was, is or becomes a duly elected or appointed member of the board of directors, officer or a functional equivalent to a member of the board of directors or officer of the Insured Organization in the event the Insured Organization is incorporated or domiciled outside the United States, member of the board of managers, Executive Officer, employee, or member of a management committee or an advisory committee of the Insured Organization."

19.     The Travelers Policy's D&O Coverage Part defines "Claim" to include all of the following, if made "against an Insured for a Wrongful Act":

1. a written demand, other than a Security Holder Derivative demand, for monetary damages or non-monetary relief;

2. a civil proceeding commenced by service of a complaint or similar pleading;

3. a criminal proceeding commenced by filing of charges;

4. a formal administrative or regulatory proceeding, commenced by filing of charges, formal investigative order, service of summons, or similar document;

5. an arbitration, mediation or similar alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

6. a Security Holder Derivative Demand solely with respect to Investigation Expenses and subject to the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations;

7. the service of a subpoena on an Insured Person identified by name if served upon such person pursuant to a formal administrative or regulatory proceeding; or

8. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding.

20.    The Travelers Policy's D&O Coverage Part defines "Wrongful Act" to include:

1. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an Insured Person in his or her capacity as such;

…

3. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the Insured Organization; or

4. any matter asserted against an Insured Person solely by reason of his or her status as such.

21.    The Travelers Policy's Liability Coverage Terms and Conditions form defines "Defense Expenses" to mean "reasonable and necessary legal fees and expenses incurred by the Company or the Insured, with the Company's consent, in the investigation, defense, settlement and appeal of a Claim, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such Claim; provided, that Defense Expenses will not include the salaries, wages, benefits or overhead of, or paid to, any Insured or any employee of such Insured."

22.    The Travelers Policy's Liability Coverage Terms and Conditions form provides that "[i]f Duty-to-Defend coverage is provided with respect to this Liability Policy as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any Claim covered by a Liability Coverage, even if the allegations are groundless, false, or fraudulent…." ITEM 7 of Declarations in turn designates the Travelers Policy as a Duty-to-Defend policy.

23.     The Travelers Policy's Liability Coverage Terms and Conditions form provides that "[i]f Duty-to-Defend coverage is provided in ITEM 7 of the Declarations and there is a Claim under any Liability Coverage in which the Insureds who are afforded coverage for such Claim incur an amount consisting of both Loss that is covered by such Liability Coverage and also loss that is not covered by such Liability Coverage because such Claim includes both covered and uncovered matters or covered and uncovered parties, then such covered Loss and uncovered loss will be allocated as follows:  a. one hundred percent (100%) of Defense Expenses incurred by the Insureds who are afforded coverage for such Claim will be allocated to covered Loss[.]"

**THE SEARCH AND SEIZURE WARRANTS AND DISAPPROVAL MEMORANDA**

24.     On or about September 26, 2018, authorized law enforcement officers associated with the United States Air Force Office of Special Investigations executed five search and seizure warrants issued by the United States District Court for the District of New Jersey upon a finding of "probable cause," at least one of which was expressly directed to property at UST Aldetec's Fair Lawn, New Jersey premises.  A true and correct copy of that Search and Seizure Warrant *In the Matter of the Search of The Premises Located at 17-01 Pollitt Drive, Fair Lawn, New Jersey 07410* is attached as **Exhibit B**.

25.     True and correct copies of Search and Seizure Warrants executed as to the persons and property of certain UST Aldetec employees ("Subject 1" and "Subject 2") together with a "Consent to Search" form signed by Subject 1 during execution of the search warrants, are attached as **Exhibit C**.  Exhibit C has been redacted for this Complaint to protect the identities of Subject 1 and Subject 2 but was provided unredacted to Travelers.  Exhibits B and C are collectively referred to as the "Search and Seizure Warrants."

26.     The Search and Seizure Warrants authorized search and seizure of UST Aldetec property and employees, including at UST Aldetec's Fair Lawn premises, "for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371," all of which statutes are termed in the Search Warrants as the "Specified Federal Offenses."

27.     On October 16, 2018, the United States Air Force, through the Defense Logistics Agency, disapproved UST Aldetec's submission of RF Monitor part number 785R537G01 under Contract SPRHA4-17-F-0034, stating that listed discrepancies "prevent use of this item" and that UST Aldetec is "in Default of this contract in accordance with the Default Clause." A true and correct copy of the October 16, 2018 Memorandum of Disapproval is attached as **Exhibit D**.

28.     On October 18, 2018, the United States Air Force, through the Defense Logistics Agency, issued a second Memorandum of Disapproval rescinding the October 16 Memorandum, which permitted resubmittal, and stating that "Due to an on-going investigation concerning this NSN/Part Number United States Technologies **will not be allowed** to resubmit another First Article for this NSN/Part Number." (emphasis original). The October 18 Memorandum repeated the statement that UST Aldetec was "in Default of this contract in accordance with the Default Clause." A true and correct copy of the October 18, 2018 Memorandum of Disapproval is attached as **Exhibit E**. Exhibits D and E are collectively referred to as the "Disapproval Memoranda."

## THE COVERAGE DISPUTE

29.     UST Aldetec provided timely written notice to Travelers of the Search and Seizure Warrants under the Travelers Policy by email on September 26, 2018. UST Aldetec subsequently provided Travelers a copy of the Disapproval Memoranda on November 8, 2018, after they were issued to UST Aldetec.

30.     On October 11, 2018, Travelers issued a letter stating that Travelers had "determined that coverage for this matter is not available at the present time under the Policy." A true and correct copy of the October 11 Travelers Letter is attached hereto as **Exhibit F**. Exhibit F has been redacted for this Complaint consistent with Exhibit C.

31.     Travelers further stated in the October 11 Travelers Letter that it was declining coverage on the purported ground that "this matter does not constitute a Potential Claim or Claim for a Wrongful Act against an Insured within the meaning of the Policy. As of this time, this matter is limited to an investigation and a Wrongful Act, as that term is defined by the Policy, has not been made against UST Aldetec Holding Company, LLC. The Search and Seizure Warrants do not assert an actual or alleged act, error, omission, misstatement, misleading statement of [sic] breach of duty or negligent [sic] by, or any matter asserted against UST Aldetec Holding Company, LLC, the Insured under the Policy."

32.     UST Aldetec responded on November 8, 2018, requesting that Travelers reverse its denial of coverage and undertake its duty to defend on the ground that the Search and Seizure Warrants initiated a Claim for Wrongful Acts and, even if they had not, that a Claim was established by the Disapproval Memoranda issued after Travelers' denial of coverage. UST Aldetec's response expressly identified the "Specified Federal Offenses" alleged in the Search and Seizure Warrants as "Wrongful Acts" and attached a copy of the Disapproval Memoranda.

33.     Travelers has not responded to the November 8, 2018 letter.

34.     There is a current dispute between UST Aldetec and Travelers as to the application of the Travelers Policy to the Search and Seizure Warrants and Disapproval Memoranda.

**FIRST CLAIM FOR RELIEF**
(Breach of Contract – Duty to Defend)

35.     UST Aldetec restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

36.     Under the Travelers Policy, Travelers undertook the duty to defend UST Aldetec against any Claim covered by the Travelers Policy and to pay 100% of UST Aldetec's Defense Expenses for such Claim.

37.     The Search and Seizure Warrants and Disapproval Memoranda constitute a Claim against UST Aldetec covered by the Travelers Policy.

38.     Travelers declined to assume its "duty to defend" UST Aldetec in connection with the Claim established by the Search and Seizure Warrants and Disapproval Memoranda and refused to pay 100% of UST Aldetec's Defense Expenses for the Claim.

39.     Travelers' denial of coverage and refusal to pay 100% of UST Aldetec's Defense constitutes a material breach of Travelers' obligations under the Travelers Policy.

40.     Travelers' breach of the Travelers Policy has proximately caused UST Aldetec harm for which UST Aldetec is entitled to damages according to proof, but in any event exceeding $75,000, exclusive of interest, attorneys' fees, and costs.

**SECOND CLAIM FOR RELIEF**
(Declaratory Judgment)

41.     UST Aldetec restates and re-alleges all of the foregoing paragraphs of this Complaint as though fully set forth herein.

42.      A justiciable controversy exists between UST Aldetec and Travelers as to their respective rights and obligations, and the scope of coverage owed to UST Aldetec under the Travelers Policy for the Claim established by the Search and Seizure Warrants and Disapproval Memoranda.

43.      UST Aldetec seeks a judicial determination to resolve a present justiciable controversy among the parties regarding the coverage of the Claim under the Travelers Policy.

44.      UST Aldetec is entitled to a judicial declaration by the Court pursuant to 28 U.S.C. §§ 2201 and 2202 that Travelers is obligated to defend and indemnify UST Aldetec for the Claim.

45.      The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, UST Aldetec respectfully requests an order as follows:

a.      Awarding UST Aldetec compensatory and consequential damages in an amount to be awarded at trial but in any event exceeding $75,000;

b.      Declaring that Travelers is obligated to defend UST Aldetec in connection with the Claim, pay 100% of its associated "Defense Expenses," and indemnify UST Aldetec against all other "Loss" for which Travelers does not first establish a policy exclusion applies;

c.      Awarding UST Aldetec its attorneys' fees and costs of suit;

d.      Awarding UST Aldetec pre-judgment and post-judgment interest; and

e.      Awarding UST Aldetec any other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

UST Aldetec hereby demands that this matter be heard before a jury on all issues so triable.

Dated: December 14, 2018

BLANK ROME LLP

By:   /s/ Jonathan M. Korn

       Stephen M. Orlofsky
       Jonathan M. Korn
       300 Carnegie Center
       Suite 220
       Princeton, NJ 08540
       Telephone:  609.750.7700
       Fascimile:  609.750.7701
       Orlofsky@BlankRome.com
       Korn@BlankRome.com

*Attorneys for Plaintiffs United States Technologies, Inc. & UST Aldetec Holding Company, LLC*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Plaintiffs United States Technologies, Inc. and UST Aldetec Holding Company, LLC know of no other arbitration or lawsuit involving this matter, nor is any to Plaintiffs' knowledge contemplated, and Plaintiffs know of no other person who should be joined at this time.

Dated: December 14, 2018

<div style="margin-left:40%">

BLANK ROME LLP

By:  /s/ Jonathan M. Korn

Stephen M. Orlofsky
Jonathan M. Korn
300 Carnegie Center
Suite 220
Princeton, NJ 08540
Telephone:  609.750.7700
Fascimile:  609.750.7701
Orlofsky@BlankRome.com
Korn@BlankRome.com

*Attorneys for Plaintiffs United States Technologies, Inc. & UST Aldetec Holding Company, LLC*

</div>

# EXHIBIT A



**One Tower Square**
**Hartford, CT 06183**

## Toll-Free ERISA HelpLine

As part of the services provided through Risk Management PLUS+ Online®, Travelers Bond & Specialty Insurance is pleased to provide its Fiduciary Liability policyholders with access to the ERISA HelpLine, a toll-free hotline designed for quick, practical guidance on day-to-day workplace issues.

To utilize the HelpLine, call **1-888-401KLAW (1-888-401-5529).**

Through the ERISA HelpLine, policyholders are eligible to receive up to one hour of consultation with an ERISA attorney from the law firm of Morgan Lewis at no charge. Morgan Lewis is a global law firm with a national ERISA practice and more than 1,400 lawyers in 22 offices throughout the world.

The ERISA HelpLine is designed to provide general guidance on issues relating to employee benefits and ERISA law. From reviewing issues related to contingent workers to questions about HIPAA, attorneys from Morgan Lewis are there to help you. The ERISA HelpLine is available toll-free from anywhere in the United States.

We encourage policyholders to take advantage of this no-cost hotline. For more information about the hotline, go to  www.rmplusonline.com/ERISAHelpLine.

This material does not amend, or otherwise affect, the provisions or coverages of any insurance policy or bond issued by Travelers. It is not a representation that coverage does or does not exist for any particular claim or loss under any such policy or bond. Coverage depends on the facts and circumstances involved in the claim or loss, all applicable policy or bond provisions, and any applicable law. Availability of coverage referenced in this document can depend on underwriting qualifications and state regulations.

Travelers Casualty and Surety Company of America,and its property casualty affiliates, 1 Tower Square, Hartford, CT 06183



**November 28, 2017**

**UST ALDETEC HOLDING COMPANY, LLC**
**17-01 POLLITT DRIVE**
**FAIR LAWN, NJ 07410**

Re: Important Information about **Claims Information Line**

Dear   **UST ALDETEC HOLDING COMPANY, LLC**

Travelers Bond & Specialty Insurance is pleased to announce its **1-800-842-8496** Claims Information Line.  This line is designed to provide insureds with an additional resource on how to report claims or those circumstances or events which may become claims.

Policyholders will be able to obtain assistance on the following topics from the Claims Information Line:

·The information that needs to be included with the claim notice

·The address, electronic mail address and/or facsimile number to which the policyholder can send claims related information

· Get questions on the claim process answered

The Declarations Page of your policy sets forth where you should report claims and claims related information.  You should also review the policy's reporting requirements to be aware of how much time you have to report a claim to Travelers.  The sooner Travelers is notified, the sooner we can become involved in the process and offer assistance to our policyholder.  A delay in reporting may result in all or part of a matter to fall outside of the coverage provided.

The Claims Information Line should streamline the claim reporting process and allow policyholders to ask questions on what information is needed as well as other questions which will assist them in working with Travelers.  While the Claims Information Line provides policyholders a valuable resource by answering questions and providing information, the line does not replace the reporting requirements contained in the Policy.

We hope this improvement to customer service is something our policyholders will find helps them understand the claim process and provides them a resource for reporting.

Best regards,

**Liam Russell**

©2009 The Travelers Companies, Inc. All Rights Reserved



**One Tower Square**
**Hartford, CT  06183**

11/28/2017

UST ALDETEC HOLDING COMPANY, LLC

17-01 POLLITT DRIVE
FAIR LAWN, NJ 07410

**RE: Risk Management PLUS+ Online® from Travelers Bond & Specialty Insurance** (www.rmplusonline.com)

As a Travelers Bond & Specialty Insured you receive risk management services, at no additional cost, to help protect you and your business.

Risk Management PLUS+ Online, is a robust website to assist you in the mitigation of risk relative to employment practices, directors and officers, fiduciary liability, cyber, crime, kidnap & ransom, and identity fraud exposures.

Highlights of Risk Management PLUS+ Online include:

- Thousands of articles on a variety of risk management topics
- Topical webinars and podcasts on current issues
- Checklists to assist in managing risk
- Web based training
- Model Employee Handbook, including policies and forms for downloading or printing that reduce risks in the workplace.

The following Risk Management PLUS+ Online Registration Instructions contain easy, step-by-step instructions to register for this valuable tool. For more information, call 1-888-712-7667 and ask for your Risk Management PLUS+ Online representative. It's that simple.

Thank you for choosing Travelers Bond & Specialty Insurance for your insurance needs. Travelers is a market leader in providing management liability and crime coverages that are specifically customized for your organization.

<u>Instructions for Registration & Orientation to Risk Management PLUS+ Online®</u>

*Registration for Site Administrators:*
The Site Administrator is the person in your organization who will oversee Risk Management PLUS+ Online for the organization. The Site Administrator is typically a person who leads human resources and/or financial functions or is responsible for legal matters pertaining to personnel. The Site Administrator may add other Site Administrators later to assist with their responsibilities. To register:

1. Go to   www.rmplusonline.com.
2. In the Sign-In box, click   **Register**.
3. Enter the password/passcode: TRVP110000
4. Fill in the Registration Information and click   **Submit**.
5. Your organization is registered, and you are registered as Site Administrator.

*Learning to Navigate the Site:*
1. Go to   www.rmplusonline.com. On each page, you will see a box outlined in blue that contains the instructions for use of that page.
2. If you have any questions, just click on   **Contact Us** on the front page. Enter your question in the form provided, and the System Administrator will get back to you quickly with the answer.
3. You can also schedule a live walk-through of the site by sending a request for a walk-through via the contact link on the front page.

© 2017 The Travelers Indemnity Company. All rights reserved.

## IMPORTANT NOTICE REGARDING INDEPENDENT AGENT AND
## BROKER COMPENSATION

For information on how Travelers compensates independent agents, brokers, or other insurance producers, please visit this website: www.travelers.com/w3c/legal/Producer_Compensation_Disclosure.html

If you prefer, you can call the following toll-free number: 1-866-904-8348. Or you can write to us at Travelers, Agency Compensation, One Tower Square, Hartford, CT 06183.

© 2015 The Travelers Indemnity Company. All rights reserved.





**Declarations**

| | |
|---|---|
| **POLICY NO.** | 106639043 |

**Travelers Casualty and Surety Company of America**
**One Tower Square**
**Hartford, Connecticut  06183**
(A Stock Insurance Company, herein called the Company)

**LIABILITY COVERAGES, SEPARATE LIABILITY COVERAGES, AND THIRD PARTY LIABILITY INSURING AGREEMENTS ARE WRITTEN ON A CLAIMS-MADE BASIS AND COVER ONLY CLAIMS MADE AGAINST INSUREDS DURING THE POLICY PERIOD.**

**THE LIMIT OF LIABILITY AVAILABLE TO PAY SETTLEMENTS OR JUDGMENTS WILL BE REDUCED BY DEFENSE EXPENSES, AND DEFENSE EXPENSES WILL BE APPLIED AGAINST THE RETENTION. THE COMPANY HAS NO DUTY TO DEFEND ANY CLAIM UNLESS DUTY-TO-DEFEND COVERAGE HAS BEEN SPECIFICALLY PROVIDED HEREIN.**

**ITEM 1**      **NAMED INSURED/INSURANCE REPRESENTATIVE:**

UST ALDETEC HOLDING COMPANY, LLC

D/B/A:


Principal Address:
17-01 POLLITT DRIVE
FAIR LAWN, NJ 07410

**ITEM 2**      **POLICY PERIOD:**

Inception Date: December 01, 2017          Expiration Date: December 01, 2018
12:01 A.M. local time both dates at the Principal Address stated in ITEM 1.

**ITEM 3**      **ADDRESS INFORMATION FOR NOTICES TO COMPANY:**

Email: BSIclaims@travelers.com
Fax: (888) 460-6622

Mail: Travelers Bond & Specialty Insurance Claim
      385 Washington St. – Mail Code 9275-NB03F
      St Paul, MN  55102

**ITEM 4**      **COVERAGES INCLUDED AS OF THE INCEPTION DATE IN ITEM 2:**

**Liability Coverages** (subject to LIA-3001 Terms & Conditions)

      Private Company Directors and Officers Liability

ACF-2001 Rev. 07-16                                      Page 1 of 4
© 2016 The Travelers Indemnity Company.  All rights reserved.

**ITEM 5**

**LIABILITY COVERAGES** (subject to LIA-3001)

| PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY |
|---|

**Limit of Liability:** $1,000,000 for all **Claims**

**Supplemental Personal Indemnification Coverage:** ☒ Applicable ☐ Not Applicable

**Supplemental Personal Indemnification Limit of Liability:** $500,000 for all **Claims**

**Additional Defense Coverage:** ☐ Applicable ☒ Not Applicable

**Additional Defense Limit of Liability:** Not Covered for all **Claims**

**Investigation Expense Limit of Liability:** $100,000 for all **Claims**

**Retention:**

$0 for each **Claim** under Insuring Agreement A.

$10,000 for each **Claim** under Insuring Agreement B.

$10,000 for each **Claim** under Insuring Agreement C.

**Prior and Pending Proceeding Date:** December 01, 2016

**Continuity Date:** December 01, 2016

| FIDUCIARY LIABILITY |
|---|

**Limit of Liability:** $1,000,000 for all **Claims**

**Settlement Program Limit of Liability:** $250,000 for each **Settlement Program Notice**, which amount is included within, and not in addition to, any applicable limit of liability

**HIPAA Limit of Liability:** $1,000,000 which amount is included within, and not in addition to, any applicable limit of liability

**Additional Defense Coverage:** ☐ Applicable ☒ Not Applicable

**Additional Defense Limit of Liability:** Not Covered for all **Claims**

**Retention:** $0 for each **Claim** under Insuring Agreement A.
$0 for each **Settlement Program Notice** under Insuring Agreement B.

© 2016 The Travelers Indemnity Company.  All rights reserved.

|                                      |                   |
|--------------------------------------|-------------------|
| **Prior and Pending Proceeding Date:** | December 01, 2016 |
| **Continuity Date:**                 | December 01, 2016 |

---

**ITEM 6**

**PREMIUM FOR THE POLICY PERIOD FOR ALL COVERAGES:**

$9,524.00     Policy Premium for all purchased Coverages

---

**ITEM 7**     **TYPE OF CLAIM DEFENSE FOR LIABILITY COVERAGES (subject to LIA-3001):**

☐     Reimbursement

☒     Duty-to-Defend

☐     Varies by Coverage - See Expanded Claim Defense Options Endorsement

Only the type of CLAIM DEFENSE marked "☒" is included in this policy.

---

**ITEM 8**     **EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGES:**

Additional Premium Percentage:   75 %
Additional Months:                       12

(If exercised in accordance with the applicable EXTENDED REPORTING PERIOD condition)

---

**ITEM 9**     **RUN-OFF EXTENDED REPORTING PERIOD FOR LIABILITY COVERAGES** (subject to LIA-3001) **AND CYBER COVERAGES:**

Additional Premium Percentage:   Not Applicable
Additional Months:                       Not Applicable

(If exercised in accordance with the applicable CHANGE OF CONTROL condition)

---

**ITEM 10**     **ANNUAL REINSTATEMENT OF THE LIABILITY COVERAGE LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001):

☐     Applicable          ☒     Not Applicable

Only those coverage features marked " ☒ Applicable" are included in this policy.

---

**ITEM 11**     **FORMS AND ENDORSEMENTS ATTACHED AT ISSUANCE FOR ALL COVERAGES:**

ACF-7007-0811; AFE-19004-0115; AFE-19008-0115; ACF-7006-0511; LIA-3001-0109; LIA-7097-0109; LIA-7114-0109; PDO-7115-0109; LIA-10002-0610; LIA-10003-0610; LIA-19002-1111; PDO-19004-0512; FRI-19014-0712; LIA-19053-0712; LIA-19097-0315; LIA-19102-0315; LIA-19109-0415; PDO-19006-0517; LIA-17002-0912; PDO-3001-0109; PDO-7061-0109; PDO-7025-1109; PDO-19009-0612; PDO-19032-1112; PDO-7064-1013; PDO-19052-0314; PDO-19053-0314; PDO-19018-0517; FRI-3001-0109; FRI-19030-0712; FRI-19084-1013; FRI-19086-0414; FRI-19093-1015; LIA-7016-0109; LIA-7017-0109; LIA-7301-0109; LIA-7310-0109; LIA-10001-0610; LIA-5029-1107

---

**ITEM 12**     **LIABILITY COVERAGE SHARED LIMIT OF LIABILITY FOR LIABILITY COVERAGES** (subject to LIA-3001):

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

☐ Applicable          ☒ Not Applicable

N/A                                    for all **Claims** under the following **Liability Coverages** that are subject to the Terms & Conditions in LIA-3001:

If the **Liability Coverages** selected in ITEM 12 are also **Scheduled Coverages** selected in ITEM 13, then the amount of the **Liability Coverage Shared Limit of Liability** set forth in ITEM 12 is part of, and not in addition to, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages** set forth in ITEM 13.

---

**ITEM 13**       **SHARED LIMIT OF LIABILITY/LIMIT OF INSURANCE FOR SCHEDULED COVERAGES:**

☐ Applicable          ☒ Not Applicable

N/A                                    for all **Claims** and limits of insurance under the following **Scheduled Coverages**:

The Company's maximum liability for the **Policy Period** for all **Claims** and limits of insurance under the **Scheduled Coverages** listed in ITEM 13 will not exceed the amount of the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**. Any Additional Defense Limit of Liability, Supplemental Personal Indemnification Limit of Liability, or Identity Fraud Expense Reimbursement Limit of Insurance is in addition to, and not part of, the **Shared Limit of Liability/Limit of Insurance for Scheduled Coverages**.

---

**PRODUCER INFORMATION:**

WILLIAM H CONNOLLY & CO
56 PARK ST
MONTCLAIR, NJ 07042

---

IN WITNESS WHEREOF, the Company has caused this policy/bond to be signed by its authorized officers.

President, Bond & Specialty Insurance                              Corporate Secretary

---

© 2016 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CROSS-COVERAGE NOTICE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

**It is agreed that:**

Notice provided to the Company of any:

1.  **Claim**, **Potential Claim**, **Settlement Program Notice**, or circumstances which may give rise to a **Claim** under any Management Coverage or **Liability Coverage**; or

2.  loss or situation that may result in loss, **Insured Event**, or **Identity Fraud** under any Crime Coverage or Other Coverage;

shall be deemed to have been provided under the Policy in its entirety.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

© 2011 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT

This endorsement modifies any Coverage Part or coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

**It is agreed that:**

The following is added to this policy. This provision can limit coverage for any loss arising out of a **Certified Act Of Terrorism** if such loss is otherwise covered by this policy. This provision does not apply if and to the extent that coverage for the loss is excluded or limited by an exclusion or other coverage limitation for losses arising out of **Certified Acts Of Terrorism** in another endorsement to this policy.

If aggregate insured losses attributable to **Certified Acts Of Terrorism** exceed $100 billion in a calendar year and the Company has met its insurer deductible under **TRIA**, the company will not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case, insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

***Certified Act Of Terrorism*** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of **TRIA**, to be an act of terrorism pursuant to **TRIA**. The criteria contained in **TRIA** for a **Certified Act Of Terrorism** include the following:

1. The act resulted in insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to **TRIA**; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

***TRIA*** means the federal Terrorism Risk Insurance Act of 2002 as amended.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2015 The Travelers Indemnity Company.  All rights reserved.

# FEDERALTERRORISM RISK INSURANCE ACT
## DISCLOSURE ENDORSEMENT

This endorsement applies to the insurance provided under any Coverage Part or coverage Form included in this policy that is subject to the federal Terrorism Risk Insurance Act of 2002 as amended.

The federal Terrorism Risk Insurance Act of 2002 as amended ("TRIA"), establishes a program under which the Federal Government may partially reimburse "Insured Losses" (as defined in TRIA) caused by "Acts Of Terrorism" (as defined in TRIA). Act Of Terrorism is defined in Section 102(1) of TRIA to mean any act that is certified by the Secretary of the Treasury – in consultation with the Secretary of Homeland Security and the Attorney General of the United States – to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States Mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

The Federal Government's share of compensation for such Insured Losses is established by TRIA and is a percentage of the amount of such Insured Losses in excess of each Insurer's "Insurer Deductible" (as defined in TRIA), subject to the "Program Trigger" (as defined in TRIA). Through 2020, that percentage is established by TRIA as follows:

- 85% with respect to such Insured Losses occurring in calendar year 2015.
- 84% with respect to such Insured Losses occurring in calendar year 2016.
- 83% with respect to such Insured Losses occurring in calendar year 2017.
- 82% with respect to such Insured Losses occurring in calendar year 2018.
- 81% with respect to such Insured Losses occurring in calendar year 2019.
- 80% with respect to such Insured Losses occurring in calendar year 2020.

In no event, however, will the Federal Government be required to pay any portion of the amount of such Insured Losses occurring in a calendar year that in the aggregate exceeds $100 billion, nor will any Insurer be required to pay any portion of such amount provided that such Insurer has met its Insurer Deductible. Therefore, if such Insured Losses occurring in a calendar year exceed $100 billion in the aggregate, the amount of any payments by the Federal Government and any coverage provided by this policy for losses caused by Acts Of Terrorism may be reduced.

For each coverage provided by this policy that applies to such Insured Losses, the charge for such Insured Losses is no more than one percent of your premium, and does not include any charge for the portion of such Insured Losses covered by the Federal Government under TRIA. Please note that no separate additional premium charge has been made for the terrorism coverage required by TRIA.  The premium charge that is allocable to such coverage is inseparable from and imbedded in your overall premium.

© 2015 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## REMOVAL OF SHORT-RATE CANCELLATION ENDORSEMENT

This endorsement changes the following:
**Private Company Directors and Officers Liability, Fiduciary Liability**

**It is agreed that:**

In any cancellation, termination or non-renewal provision, any reference to computing a premium on a short rate basis is replaced with a reference to computing such premium on a pro-rata basis.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

© 2011 The Travelers Indemnity Company. All rights reserved.



**LIABILITY COVERAGE TERMS AND CONDITIONS**

***THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE COVERAGE LIMITS.
PLEASE READ THE POLICY CAREFULLY.***

**CONSIDERATION CLAUSE**

IN CONSIDERATION of the payment of the premium, in reliance on the statements in the **Application,** subject to the Declarations, and pursuant to all the terms, conditions, exclusions and limitations of this **Policy**, the Company and the Insureds agree as follows:

**I.      GENERAL**

These **Liability Coverage** Terms and Conditions apply to all **Liability Coverages**.  Unless otherwise stated to the contrary, the terms and conditions of each **Liability Coverage** apply only to that particular **Liability Coverage**.  If any provision in these Liability Coverage Terms and Conditions is inconsistent or in conflict with the terms and conditions of any particular **Liability Coverage**, such **Liability Coverage's** terms, conditions, and limitations will control for purposes of that **Liability Coverage**.

**II.     DEFINITIONS**

Wherever appearing in this **Liability Policy**, the following words and phrases appearing in bold type will have the meanings set forth in this Section II. DEFINITIONS:

**A.**     ***Additional Defense Limit of Liability*** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**. If  "*Not Applicable*" is shown as the amount of any **Liability Coverage's Additional Defense Limit of Liability**, then any reference to the **Additional Defense Limit of Liability** will be deemed to be deleted from such **Liability Coverage**.

**B.**     ***Annual Reinstatement of the Liability Coverage Limit of Liability*** means, if included in ITEM 10 of the Declarations, the reinstatement of each applicable **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for each applicable **Liability Coverage** for each **Policy Year** during the **Policy Period**.

**C.**     ***Application***  means the application deemed to be attached to and forming a part of this **Liability Policy**, including any materials submitted and statements made in connection with that application. If the **Application** uses terms or phrases that differ from the terms defined in this **Liability Policy**, no inconsistency between any term or phrase used in the **Application** and any term defined in this **Liability Policy**  will waive or change any of the terms, conditions and limitations of this **Liability Policy**.

**D.**     ***Change of Control*** means:
1.     the acquisition of the **Named Insured**, or of all or substantially all of its assets, by another entity, or the merger or consolidation of the **Named Insured** into or with another entity such that the **Named Insured** is not the surviving entity; or
2.     the obtaining by any person, entity or affiliated group of persons or entities the right to elect, appoint or designate more than fifty percent (50%) of the board of directors, board of trustees, board of managers, or functional equivalent thereof or to exercise a majority control of the board of directors, board of trustees, board of managers, or a functional equivalent thereof of the **Named Insured**.

**E.**     ***Claim*** has the meaning set forth in the applicable **Liability Coverage**.

**F.**     ***Defense Expenses*** means reasonable and necessary legal fees and expenses incurred by the Company or the **Insured**, with the Company's consent, in the investigation, defense, settlement and appeal of a **Claim**, including but not limited to, cost of expert consultants and witnesses, premiums for appeal, injunction, attachment or supersedeas bonds (without the obligation to furnish such bonds) regarding such **Claim**; provided, that **Defense Expenses** will not include the salaries, wages, benefits or overhead of, or paid to, any **Insured** or any employee of such **Insured**.

**G.**     ***Executive Officer*** has the meaning set forth in the applicable **Liability Coverage**.

**H.**     ***Financial Insolvency*** means, with respect to the **Insured Organization** or any **Outside Entity**, the appointment of a receiver, conservator, liquidator, trustee, or similar official; or the inability of the **Insured Organization** or **Outside Entity** financially to indemnify the **Insured Persons**.

**I.**     ***Foreign Parent Corporation*** means any entity incorporated outside the United States, which owns more than fifty percent (50%) of the outstanding securities or voting rights representing the right to vote for the election of, or to appoint the **Named Insured's** board of directors, board of trustees or board of managers, or to exercise a majority control of the board of directors, board of trustees or board of managers of the **Named Insured**.

**J.**     ***Insured***  has the meaning set forth in the applicable **Liability Coverage**.

**K.**     ***Insured Organization*** has the meaning set forth in the applicable **Liability Coverage**.

**L.**     ***Insured Person*** has the meaning set forth in the applicable **Liability Coverage**.

**M.**     ***Liability Coverage*** means, individually or collectively, the **Liability Coverages** that have been purchased, as indicated in ITEM 4 of the Declarations.

**N.**     **Liability Coverage Limit of Liability** means the amount set forth in ITEM 5 of the Declarations for each applicable **Liability Coverage**.

**O.**     ***Liability Coverage Shared Limit of Liability*** means the amount set forth in ITEM 12 of the Declarations. If "*Not Applicable"*  is shown in ITEM 12 of the Declarations or ITEM 4 of the Declarations indicates that only one **Liability Coverage** is included in this **Liability Policy**, any reference to either the **Liability Coverage Shared Limit of Liability** or ITEM 12 of the Declarations will be deemed to be deleted from this **Liability Policy**.

**P.**     ***Liability Policy*** means, collectively, the Declarations, the **Application**, the Liability Coverage Terms and Conditions, each purchased **Liability Coverage**, and any endorsements attached thereto.

**Q.**     ***LLC Manager*** means any natural person who was, is or becomes a manager, member of the board of managers, or a functionally equivalent executive of an **Insured Organization** that is a limited liability company.

**R.**     ***Loss*** has the meaning set forth in the applicable **Liability Coverage**.

**S.**     ***Named Insured*** means any entity named in ITEM 1 of the Declarations.

**T.**     ***Policy Period*** means the period from the Inception Date to the Expiration Date set forth in ITEM 2 of the Declarations.  In no event will the **Policy Period** continue past the effective date of cancellation or termination of this **Liability Policy**.

**U.**     ***Policy Year*** means:
    1.     the period of one year following the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof;
    2.     the time between the Inception Date set forth in ITEM 2 of the Declarations or any anniversary thereof and the effective date of cancellation or termination of this **Liability Policy** if such time period is less than one year;

---

3.   with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of  such **Liability Coverage** and any anniversary of this **Liability Policy** if the time between the inception date of such **Liability Coverage** and any anniversary of this **Liability Policy** is less than one year; and

4.   with respect to a **Liability Coverage** added to this **Liability Policy** after the Inception Date set forth in ITEM 2, the time between the inception date of such **Liability Coverage** and the effective date or cancellation or termination of this **Liability Policy,** if such time is less than one year.

**V.**   *Pollutant* means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.  Waste includes materials to be recycled, reconditioned or reclaimed.

**W.**   *Potential Claim* means any **Wrongful Act** that may subsequently give rise to a **Claim**.

**X.**   *Related Wrongful Act* means all **Wrongful Acts** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event or decision.

**Y.**   *Subsidiary* has the meaning set forth in the applicable **Liability Coverage**.

**Z.**   *Wage and Hour Law* means any federal, state, or local law or regulation governing or related to the payment of wages including the payment of overtime, on-call time, minimum wages, meals, rest breaks or the classification of employees for the purpose of determining employees' eligibility for compensation under such law(s).

**AA.**   *Wrongful Act* has the meaning set forth in the applicable **Liability Coverage**.

---

**III.**   *CONDITIONS*

---

**A.**   **TERRITORY**

This **Liability Policy** applies to **Claims** made or **Wrongful Acts** occurring anywhere in the world.

**B.**   **RETENTION**

The **Insured** shall bear uninsured at its own risk the amount of any applicable Retention, which amount must be paid in satisfaction of  **Loss.**

If any **Claim** gives rise to coverage under a single **Liability Coverage**, the Company has no obligation to pay **Loss**, including **Defense Expenses**, until the applicable Retention amount set forth in ITEM 5 of the Declarations has been paid by the **Insured**.

If any **Claim** is subject to different Retentions under a single **Liability Coverage**, the applicable Retentions will be applied separately to each part of such **Claim**, but the sum of such Retentions will not exceed the largest applicable Retention under such **Liability Coverage**.

If any **Claim** gives rise to coverage under two or more **Liability Coverages**, the Company shall have no obligation to pay  **Loss**, including **Defense Expenses**, until the largest Retention that is applicable to such **Claim** under such **Liability Coverages** has been paid by the **Insured**.

No Retention will apply to an **Insured Person** if indemnification by the **Insured Organization** is not permitted by law or if the **Insured Organization** is unable to make such indemnification solely by reason of its **Financial Insolvency**. The **Insured Organization** will be conclusively deemed to have indemnified all  **Insured Persons**  to the extent that the **Insured Organization** is permitted or required to indemnify them pursuant to law, common or statutory, or contract, or the charter or by-laws of the **Insured Organization**.

The Company, at its sole discretion, may pay all or part of the Retention amount on behalf of any **Insured**, and in such event, the **Insureds** agree to repay the Company any amounts so paid.

---

**C.     LIMITS OF LIABILITY**

1.     Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, and further subject to any applicable **Liability Coverage Shared Limit of Liability** or **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under each applicable **Liability Coverage** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the **Declarations** for each applicable **Liability Coverage**; and

b.     in the event that a **Claim** triggers more than one **Liability Coverage**, the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for any such **Claim** will not exceed the sum of the remaining **Liability Coverage Limits of Liability** of the applicable **Liability Coverages**.

2.     Liability Coverage Shared Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established; and further subject to any applicable **Annual Reinstatement of the Liability Coverage Limit of Liability**, if ITEM 4 of the Declarations indicates that more than one **Liability Coverage** has been purchased and a **Liability Coverage Shared Limit of Liability** is shown in ITEM 12 of the Declarations:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will not exceed the remaining **Liability Coverage Shared Limit of Liability**; and

b.     if the **Liability Coverage Shared Limit of Liability** is exhausted by the payment of amounts covered under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, the premium for all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be fully earned, all obligations of the Company under all **Liability Coverages** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations, will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under any **Liability Coverage** subject to the **Liability Coverage Shared Limit of Liability**, as set forth in ITEM 12 of the Declarations.

3.     Annual Reinstatement of the Liability Coverage Limit of Liability

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 10 of the Declarations includes an **Annual Reinstatement of the Liability Coverage Limit of Liability**:

a.     the Company's maximum limit of liability for all **Loss**, including **Defense Expenses**, for all **Claims** made during each **Policy Year** will not exceed the remaining **Liability Coverage Limit of Liability** stated in ITEM 5 of the Declarations for each applicable **Liability Coverage** or, if applicable, the remaining **Liability Coverage Shared Limit of Liability**; and

b.     with regard to the Extended Reporting Period or the Run-Off Extended Reporting Period, if applicable, the Company's maximum limit of liability for all **Claims** made during the Extended Reporting Period or the Run-Off Extended Reporting Period will not exceed the remaining **Liability Coverage Limit of Liability** or, if applicable, the **Liability Coverage Shared Limit of Liability** for the last **Policy Year** in effect at the time of the termination or cancellation of the **Liability Coverage** or the **Change of Control**.

4.      Other Provisions

Payment of **Defense Expenses** will reduce and may exhaust all applicable limits of liability. In the event the amount of **Loss** exceeds the portion of the applicable limit of liability remaining after prior payments of **Loss**, the Company's liability will not exceed the remaining amount of the applicable limit of liability. In no event will the Company be obligated to make any payment for **Loss** , including **Defense Expenses**, with regard to a **Claim** after the applicable limit of liability has been exhausted by payment or tender of payment of **Loss**.

If a **Liability Coverage Limit of Liability** is exhausted by the payment of amounts covered under such **Liability Coverage**, the premium for such **Liability Coverage** will be fully earned, all obligations of the Company under such **Liability Coverage** will be completely fulfilled and exhausted, including any duty to defend, and the Company will have no further obligations of any kind or nature whatsoever under such **Liability Coverage**.

**D.     ADDITIONAL DEFENSE COVERAGE**

Regardless of the number of persons or entities bringing **Claims** or the number of persons or entities who are **Insureds**, and regardless of when payment is made by the Company or when an **Insured's** legal obligation with regard thereto arises or is established, if ITEM 5 of the Declarations indicates that any **Liability Coverage** includes Additional Defense Coverage, **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of any **Claim** made during the **Policy Period** under any such **Liability Coverage** will apply first to and reduce the **Additional Defense Limit of Liability**. The **Additional Defense Limit of Liability** will be in addition to, and not part of, such **Liability Coverage's** applicable **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. The **Additional Defense Limit of Liability** is applicable to **Defense Expenses** only. If the **Annual Reinstatement of the Liability Coverage Limit of Liability** is applicable, the **Additional Defense Limit of Liability** will be reinstated for each **Policy Year**.

Upon exhaustion of the Additional Defense Limit of Liability:

1.      **Defense Expenses** incurred by the Company or the **Insured**, with the Company's consent, in the defense of a **Claim** are part of and not in addition to any applicable limit of liability; and

2.      payment by the Company or the **Insured** , with the Company's consent, of **Defense Expenses** reduces any applicable limit of liability.

**E.     CLAIM  DEFENSE**

1.      If Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend any **Claim** covered by a **Liability Coverage**, even if the allegations are groundless, false or fraudulent, including the right to select defense counsel with respect to such **Claim**; provided, that the Company will not be obligated to defend or to continue to defend any **Claim** after the applicable limit of liability has been exhausted by payment of **Loss**.

2.      If Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations:

a.      the Company will have no duty to defend any **Claim** covered by a **Liability Coverage**. It will be the duty of the **Insured** to defend such **Claims**; and the Company will have the right to participate with the **Insured** in the investigation, defense and settlement, including the negotiation of a settlement of any **Claim** that appears reasonably likely to be covered in whole or in part by such **Liability Coverage** and the selection of appropriate defense counsel; and

b.      upon written request, the Company will advance **Defense Expenses** with respect to such **Claim**. Such advanced payments by the Company will be repaid to the Company by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** are not entitled to payment of such **Defense Expenses** under such **Liability Coverage**. As a condition of any payment of **Defense Expenses** under this subsection, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of any **Defense Expenses** paid to or on behalf of any **Insured** if it is finally determined that any such **Claim** or portion of any **Claim** is not covered under such **Liability Coverage**.

3.      The **Insured** agrees to cooperate with the Company and, upon the Company's request, assist in making settlements and in the defense of **Claims** , in enforcing rights of contribution and indemnity against any person or entity which may be liable to the **Insured** because of an act or omission insured under such **Liability Coverage**, will attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

## F.      INSURED'S DUTIES IN THE EVENT OF A CLAIM

The **Insured's** duty to report a **Claim** commences on the earliest date a written notice thereof is received by an **Executive Officer.** If an **Executive Officer** becomes aware that a **Claim** has been made against any **Insured**, the **Insured**, as a condition precedent to any rights under this **Liability Policy,** must give to the Company written notice of the particulars of such **Claim**, including all facts related to any alleged **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act**, and the dates of the alleged events, as soon as practicable. The **Insured** agrees to give the Company such information, assistance and cooperation as it may reasonably require.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt. The **Insured** agrees not to voluntarily settle any **Claim**, make any settlement offer, assume or admit any liability or, except at the **Insured's** own cost, voluntarily make any payment, pay or incur any **Defense Expenses**, or assume any obligation or incur any other expense, without the Company's prior written consent, such consent not to be unreasonably withheld. The Company is not liable for any settlement, **Defense Expenses**, assumed obligation or admission to which it has not consented.

## G.      NOTICE OF POTENTIAL CLAIMS

If an **Insured** becomes aware of a **Potential Claim** and gives the Company written notice of the particulars of such **Potential Claim,** including all facts related to the **Wrongful Act**, the identity of each person allegedly involved in or affected by such **Wrongful Act** , the dates of the alleged events, and the reasons for anticipating a **Claim** , as soon as practicable during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, any **Claim** subsequently made against any **Insured** arising out of such **Wrongful Act** will be deemed to have been made during the **Policy Period**.

All notices under this subsection must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt.

## H.      RELATED  CLAIMS

All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be considered as a single **Claim** or **Potential Claim**, whichever is applicable, for purposes of this **Liability Policy**. All **Claims** or **Potential Claims** for **Related Wrongful Acts** will be deemed to have been made at the time the first of such **Claims** or **Potential Claims** for **Related Wrongful Acts** was made whether prior to or during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## I.      SUBROGATION

In the event of payment under this **Liability Policy**, the Company is subrogated to all of the **Insured's** rights of recovery against any person or organization to the extent of such payment and the **Insured** agrees to execute and deliver instruments and papers and do whatever else is necessary to secure such rights. The **Insured** will do nothing to prejudice such rights.

## J.      RECOVERIES

All recoveries from third parties for payments made under this **Liability Policy** will be applied, after first deducting the costs and expenses incurred in obtaining such recovery, in the following order of priority:

1.      first, to the Company to reimburse the Company for any Retention amount it has paid on behalf of any **Insured**;

2.      second, to the **Insured** to reimburse the **Insured** for the amount it has paid which would have been paid hereunder but for the fact that it is in excess of the applicable limits of liability hereunder;

3.    third, to the Company to reimburse the Company for the amount paid hereunder; and

4.    fourth, to the **Insured** in satisfaction of any applicable Retention;

provided, recoveries do not include any recovery from insurance, suretyship, reinsurance, security or indemnity taken for the Company's benefit.

## K.    CHANGE OF CONTROL

If, during the **Policy Period**, a **Change of Control** occurs, coverage will continue in full force and effect with respect to **Claims** for **Wrongful Acts** committed before such event, but coverage will cease with respect to **Claims** for **Wrongful Acts** committed after such event.  No coverage will be available hereunder for **Loss**, including **Defense Expenses**, for any **Claim** based upon, alleging, arising out of, or in any way relating to, directly or indirectly any **Wrongful Act** committed or allegedly committed after such event.  After any such event, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

Upon the occurrence of any **Change of Control**, the **Named Insured** will have the right to give the Company notice that it desires to purchase a Run-Off Extended Reporting Period for any **Liability Coverage** for the period set forth in ITEM 9 of the Declarations following the effective date of such **Change of Control**, regarding **Claims** made during such Run-Off Extended Reporting Period against persons or entities who at the effective date of the **Change of Control** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to such **Change of Control** and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Run-Off Extended Reporting Period will not provide new, additional or renewed limits of liability; and

2.    the Company's total liability for all **Claims** made during such Run-Off Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the **Change of Control**.

The premium due for the Run-Off Extended Reporting Period will equal the percentage set forth in ITEM 9 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Period** prior to the **Change of Control**. The entire premium for the Run-Off Extended Reporting Period will be deemed fully earned at the commencement of such Run-Off Extended Reporting Period.

The right to elect the Run-Off Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within thirty (30) days of the **Change of Control**. In the event the Run-Off Extended Reporting Period is purchased, the option to purchase the Extended Reporting Period in Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions will terminate. In the event the Run-Off Extended Reporting Period is not purchased, the **Named Insured** will have the right to purchase the Extended Reporting Period under the terms of Section III. CONDITIONS O. EXTENDED REPORTING PERIOD of these Liability Coverage Terms and Conditions.

If, at any time during the **Policy Period**, the **Insured Organization** eliminates or reduces its ownership interest in, or control over a **Subsidiary**, such that it no longer meets the definition of a **Subsidiary**, coverage will continue for such entity but only with regard to **Claims** for **Wrongful Acts** which occurred wholly during the time that the entity was a **Subsidiary**.

## L.    ACQUISITIONS

If, during the **Policy Period**, the **Insured Organization** acquires or forms a **Subsidiary**, this **Liability Policy** will provide coverage for such **Subsidiary** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Policy**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company may require, all within ninety (90) days after the effective date of such formation or acquisition. Coverage for such **Subsidiary** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed 30% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period**.

**M.     SPOUSAL AND DOMESTIC PARTNER LIABILITY COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply to **Loss** resulting from a **Claim** made against a person who, at the time the **Claim** is made, is a lawful spouse or a person qualifying as a domestic partner under the provisions of any applicable federal, state or local law (a "Domestic Partner") of an **Insured Person**, but only if and so long as:

1.     the **Claim** against such spouse or Domestic Partner results from a **Wrongful Act** actually or allegedly committed by the **Insured Person**, to whom the spouse is married, or who is joined with the Domestic Partner; and

2.     such **Insured Person** and his or her spouse or Domestic Partner are represented by the same counsel in connection with such **Claim**.

No spouse or Domestic Partner of an **Insured Person** will, by reason of this subsection have any greater right to coverage under this **Liability Policy** than the **Insured Person** to whom such spouse is married, or to whom such Domestic Partner is joined.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a spouse or Domestic Partner of an **Insured Person** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such spouse or Domestic Partner.

**N.     FOREIGN PARENT CORPORATION COVERAGE**

This **Liability Policy** will, subject to all of its terms, conditions, and limitations, be extended to apply coverage for **Defense Expenses** resulting from any **Claim** made against a **Foreign Parent Corporation**, but only if and so long as:

1.     such **Claim** results from a **Wrongful Act** actually or allegedly committed solely by any **Insured**;

2.     such **Insured** and the **Foreign Parent Corporation** are represented by the same counsel in connection with such **Claim**; and

3.     such **Insured** is included as a co-defendant.

No **Foreign Parent Corporation** will, by reason of this subsection, have any greater right to coverage under this **Liability Policy** than any **Insured**.

The Company has no obligation to make any payment for **Loss** in connection with any **Claim** against a **Foreign Parent Corporation** for any actual or alleged act, error, omission, misstatement, misleading statement, neglect or breach of duty by such **Foreign Parent Corporation** or any member of the board of directors, officer, employee, or functional equivalent thereof.

**O.     EXTENDED REPORTING PERIOD**

At any time prior to or within 60 days after the effective date of termination or cancellation of any Liability Coverage for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.     such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability; and

2.     the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation.  The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of the termination or cancellation.

**P.   ALLOCATION**

1.   If Duty-to-Defend coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, then such covered  **Loss**  and uncovered loss will be allocated as follows:

   a.   one hundred percent (100%) of **Defense Expenses** incurred by the **Insureds** who are afforded coverage for such **Claim** will be allocated to covered **Loss**; and

   b.   all loss other than **Defense Expense** will be allocated between covered **Loss** and uncovered loss based upon the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the **Insured Persons**, the **Insured Organization**, and others not insured under such **Liability Coverage**.  In making such a determination, the **Insured Organization**, the **Insured Persons** and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

2.   If Reimbursement coverage is indicated in ITEM 7 of the Declarations and there is a **Claim** under any **Liability Coverage** in which the **Insureds** who are afforded coverage for such **Claim** incur an amount consisting of both **Loss** that is covered by such **Liability Coverage** and also loss that is not covered by such **Liability Coverage** because such **Claim** includes both covered and uncovered matters or covered and uncovered parties, the **Insureds**  and the Company agree to use their best efforts to determine a fair and proper allocation of all such amounts.  In making such a determination, the parties will take into account the relative legal and financial exposures of, and relative benefits obtained in connection with the defense and settlement of the **Claim** by the  **Insured Persons**, the **Insured Organization**, and others not insured under the applicable **Liability Coverage**.  In the event that an allocation cannot be agreed to, then the Company will be obligated to make an interim payment of the amount of **Loss** which the parties agree is not in dispute until a final amount is agreed upon or determined pursuant to the provisions of the applicable **Liability Coverage** and applicable law.

**Q.   CANCELLATION**

The Company may cancel this **Liability Policy** for failure to pay a premium when due, in which case twenty (20) days written notice will be given to the **Named Insured**, unless, payment in full is received within twenty (20) days of the **Named Insured's** receipt of such notice of cancellation. The Company has the right to the premium amount for the portion of the **Policy Period** during which this **Liability Policy** was in effect.

Subject to the provisions set forth in Section III. CONDITIONS K. CHANGE OF CONTROL, the **Named Insured** may cancel any **Liability Coverage** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective.  In the event the **Named Insured** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this **Liability Policy** upon its expiration.  If the Company elects not to renew, it will provide to the **Named Insured** written notice to that effect at least thirty (30) days before the Expiration Date set forth in ITEM 2 of the Declarations.

**R.**     **ACTION AGAINST THE COMPANY**

No action will lie against the Company unless there has been full compliance with all of the terms of this **Liability Policy**.

No person or organization has any right under this **Liability Policy** to join the Company as a party to any action against the **Insured** to determine the **Insured's** liability, nor may the Company be impleaded by an **Insured**  or said **Insured's** legal representative.  Bankruptcy or insolvency of any **Insured** or an **Insured's** estate does not relieve the Company of any of its obligations hereunder.

**S.**     **CHANGES**

Only the **Named Insured** is authorized to make changes in the terms of this **Liability Policy** and solely with the Company's prior written consent.  This **Liability Policy's** terms can be changed, amended or waived only by endorsement issued by the Company and made a part of this **Liability Policy**.  Notice to any representative of the  **Insured**  or knowledge possessed by any agent or by any other person will not effect a waiver or change to any part of this **Liability Policy**, or estop the Company from asserting any right under the terms, conditions and limitations of this **Liability Policy**, nor may the terms, conditions and limitations hereunder be waived or changed, except by a written endorsement to this **Liability Policy** issued by the Company.

**T.**     **ASSIGNMENT**

This **Liability Policy** may not be assigned or transferred, and any such attempted assignment or transfer is void and without effect unless the Company has provided its prior written consent to such assignment or transfer.

**U.**     **REPRESENTATIONS**

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Liability Policy**  is issued in reliance upon the truth of such representations, and embodies all agreements existing between said  **Insured**  and the Company or any of its agents.

If any statement or representation in the **Application** is untrue with respect to any **Liability Coverage**, such **Liability Coverage** is void and of no effect whatsoever, but only with respect to:

1.     any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;

2.     any  **Insured Organization**, with respect to its indemnification coverage, to the extent it indemnifies any **Insured Person** referenced in 1. above; and

3.     any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

**V.**     **LIBERALIZATION**

If, during the **Policy Period**, the Company is required, by law or by insurance supervisory authorities of the state in which this **Liability Policy** was issued, to make any changes in the form of this **Liability Policy**, by which the insurance afforded by this **Liability Policy** could be extended or broadened without increased premium charge by endorsement or substitution of form, then such extended or broadened insurance will inure to the benefit of the **Insured** as of the date the revision or change is approved for general use by the applicable department of insurance.

**W.**     **AUTHORIZATION**

By acceptance of the terms herein, the **Named Insured** agrees to act on behalf of all **Insureds** with respect to the payment of premiums, the receiving of any return premiums that may become due hereunder, and the receiving of notices of cancellation, nonrenewal, or change of coverage, and the **Insureds** each agree that they have, individually and collectively, delegated such authority exclusively to the **Named Insured**; provided, that nothing herein will relieve the **Insureds** from giving any notice to the Company that is required under this **Liability Policy**.

**X.**     **ENTIRE AGREEMENT**

The Declarations, the **Application**, the Liability Coverage Terms and Conditions, each **Liability Coverage**, and any endorsements attached thereto, constitute the entire agreement between the Company and the **Insured**.

**Y.**     **HEADINGS**

The titles of the various paragraphs of this **Liability Policy** and its endorsements are inserted solely for convenience or reference and are not to be deemed in any way to limit or affect the provision to which they relate.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**AMEND NUMBER OF DAYS FOR ELECTING EXTENDED REPORTING PERIOD ENDORSEMENT**

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

**It is agreed that:**

Solely with respect to the **Liability Coverage(s)** shown above, section **III. CONDITIONS, O. EXTENDED REPORTING PERIOD** of the **Liability Coverage Terms and Conditions** is replaced by the following:

O.    **EXTENDED REPORTING PERIOD**

At any time prior to or within **90** days after the effective date of termination or cancellation of any Liability Coverage for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the Declarations following the effective date of such termination or cancellation, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of the termination or cancellation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions:

1.    such Extended Reporting Period will not provide a new, additional or renewed limit(s) of liability; and

2.    the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancellation;

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation.  The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within **90** days of the effective date of the termination or cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## AMEND ACQUISITIONS CONDITION – NO NOTICE OR APPLICATION REQUIRED FOR FORMED SUBSIDIARY ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

I**t is agreed that:**

Solely with respect to the **Liability Coverages** shown above, section **III. CONDITIONS, L**. **ACQUISITIONS** of the **Liability Coverage Terms and Conditions** is amended by adding the following:

Notwithstanding any provision in this **Liability Policy** or this provision to the contrary, the **Insured** need not complete an application for, and need not provide written notice of, the formation of any **Subsidiary** during the **Policy Period** by the **Insured Organization** in order for the Company to provide coverage for a formed **Subsidiary** and **Insured Persons** thereof.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

**NETWORK AND INFORMATION SECURITY OFFENSE COVERAGE ENDORSEMENT WITH ADDITIONAL EXPENSE LIMIT OF LIABILITY FOR CRISIS MANAGEMENT EVENT EXPENSES**

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

1. The following is added to section **III. CONDITIONS**, **C. LIMITS OF LIABILITY**, 1., of the Liability Terms and Conditions:

   The Company's maximum limit of liability for all **Crisis Management Event Expenses** under the Private Company Directors and Officers Liability coverage will not exceed the Crisis Management Event Expenses Limit of Liability set forth in ITEM 5 of the Declarations. The Crisis Management Event Expenses Limit of Liability is in addition to the **Liability Coverage Limit of Liability** for the Private Company Directors and Officers Liability coverage. However, if **Crisis Management Event Expenses** are covered under more than one **Liability Coverage** made part of this **Liability Policy**, then the Company's maximum liability for such **Crisis Management Event Expenses** will not exceed the amount of the largest applicable and remaining Crisis Management Event Expenses Limit of Liability for any **Liability Coverage** set forth in the Declarations, which will be the maximum amount applicable to all **Crisis Management Event Expenses** under the **Liability Policy**.

2. The following is added to section **I. INSURING AGREEMENTS** of the Private Company Directors and Officers Liability coverage:

   The Company will pay on behalf of the **Insured Organization** , **Crisis Management Event Expenses** incurred by the **Insured Organization** as a result of any **Network and Information Security Offense** first occurring and reported to the Company during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period. The payment of **Crisis Management Event Expenses** is not subject to any Retention.

3. The following replaces section **III. DEFINITIONS**, **M.**, of the Private Company Directors and Officers Liability coverage:

   **M.**    **Wrongful Act** means:

   1. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her capacity as such;

   2. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her **Outside Position**;

   3. any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the **Insured Organization**;

   4. any actual or alleged **Network and Information Security Offense** by, or asserted against, an **Insured Person**, in his or her capacity as such, or the **Insured Organization**; or

   5. any matter asserted against an **Insured Person** solely by reason of his or her status as such.

   All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

4.    The following are added to section **III. DEFINITIONS**, of the Private Company Directors and Officers Liability coverage:

*Computer Virus* means any malicious code which could destroy, alter, contaminate, or degrade the integrity, quality, or performance of data of any computer application software, computer network, or computer operating system or related network, upon the introduction of such malicious code through any computer, communications equipment, or communications network that is owned or operated by the **Insured Organization**.

*Crisis Management Event Expenses* means reasonable fees, costs, and expenses incurred and paid by the **Insured Organization** for services provided by a public relations firm to the **Insured Organization** to mitigate any actual or potential negative publicity resulting from any **Network and Information Security Offense**. **Crisis Management Event Expenses** do not include any:

1.    costs to notify any individual or entity of a **Network and Information Security Offense** or to develop such notification documents or materials;

2.    costs to determine the scope of, or whether any, **Network and Information Security Offense** has occurred; or

3.    costs paid by any **Insured** intended as compensation for any individual or entity as a result of a **Network and Information Security Offense**.

*Network and Information Security Offense* means:

1.    the failure to prevent the transmission of a **Computer Virus**;

2.    the failure to provide any authorized user of the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, with access to such website, or computer or communications network;

3.    the failure to prevent unauthorized access to, or use of, data containing private or confidential information of others; or

4.    the failure to provide notification of any actual or potential unauthorized access to, or use of, data containing private or confidential information of others if such notification is required by any state or federal regulation or statute.

5.    The following replaces section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 2., of the Private Company Directors and Officers Liability coverage:

2.    The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, loss of reputation, libel, slander, oral or written publication of defamatory or disparaging material, or invasion of privacy; provided that this exclusion will not apply to:

a.    any **Claim** for emotional distress, mental anguish, or humiliation with respect to any employment related **Wrongful Act**;

b.    any **Security Holder Derivative Claim**; or

c.    any **Claim** for invasion, infringement or interference with the rights of privacy with respect to any **Network and Information Security Offense**.

6.    The following is added to section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, of the Private Company Directors and Officers Liability coverage:

The **Company** will not be liable for **Loss** for any **Claim** based upon or arising out of any **Network and Information Security Offense** that results in:

a.    the failure to provide access to the **Insured Organization's** website, or the **Insured Organization's** computer or communications network, that was expected or intended by any **Insured**; or

b.    any Internet service interruption or failure; provided that this exclusion will not apply if the interruption or failure was caused by an **Insured**.

©2009 The Travelers Companies, Inc. All Rights Reserved

7.    The following is added to ITEM 5 of the Declarations:

**Crisis Management Event Expenses**
**Limit of Liability:**                    **$25,000 for all Crisis Management Event Expenses**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NON-RESCISSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

**It is agreed that:**

The following replaces section *III. CONDITIONS*, **U. REPRESENTATIONS** of the Liability Coverage Terms and Conditions:

**U.     REPRESENTATIONS**

By acceptance of the terms set forth in this **Liability Policy**, each **Insured** represents and agrees that the statements contained in the **Application**, which is deemed to be attached hereto, incorporated herein, and forming a part hereof, are said **Insured's** agreements and representations, that such representations are material to the Company's acceptance of this risk, that this **Liability Policy** is issued in reliance upon the truth of such representations, and embodies all agreements existing between said **Insured** and the Company or any of its agents.

With respect to all the statements contained in the **Application,** no knowledge possessed by any one **Insured Person** will be imputed to any other **Insured Person.**

The Company will not, under any circumstance, rescind this **Liability Coverage** with respect to any **Insured**. However, the Company and the **Insureds** agree that if any statement or representation in the **Application** is untrue or inaccurate with respect to such **Liability Coverage**, then no coverage shall be afforded under such **Liability Coverage** for any **Claim** based upon, arising out of, or attributable to the subject matter of any such untrue or inaccurate statement or representation with respect to:

1.      any **Insured Person** who knew, as of the Inception Date set forth in ITEM 2 of the Declarations, that the statement or representation was untrue;

2.      any **Insured Organization**, with respect to its indemnification coverage, to the extent it indemnifies any **Insured Person** referenced in 1. above; and

3.      any **Insured Organization**, if the person who signed the **Application** knew that the statement or representation was untrue.

Whether an **Insured Person** had such knowledge will be determined without regard to whether the **Insured Person** actually knew the **Application**, or any other application completed for this **Liability Policy**, contained any such untrue statement or representation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106639043

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## ACQUISITIONS CONDITION TO PROVIDE 35% AUTOMATIC COVERAGE THRESHOLD FOR NEWLY ACQUIRED OR FORMED SUBSIDIARIES ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

---

**It is agreed that:**

The following replaces the second paragraph of section ***III. CONDITIONS*, L. ACQUISITIONS** of the Liability Coverage Terms and Conditions:

The 90 day notice requirement and the 90-day limitation of coverage will not apply provided that: (1) the assets of the acquired or formed **Subsidiary** do not exceed 35% of the total assets of the **Insured Organization** as reflected in the **Insured Organization's** most recent fiscal year-end financial statement; or (2) the acquisition or formation occurs less than 90 days prior to the end of the **Policy Period**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106639043

---

LIA-10003 Ed. 06-10 Printed in U.S.A.                                                                                    Page 1 of 1
©2010 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADVANCEMENT OF THE RETENTION ENDORSEMENT

This endorsement changes the following:
**Fiduciary Liability**

**It is agreed that:**

The following is added to section **III. *CONDITIONS*,** **B. RETENTION** of the Liability Coverage Terms and Conditions:

Notwithstanding anything in this section III. CONDITIONS, B. RETENTION to the contrary, if the **Insured Organization** is permitted by law to indemnify any **Insured Person** for any applicable Retention but refuses or fails to do so and such refusal or failure is not by reason of **Financial Insolvency**, then the Company will advance the amount of any applicable Retention that would otherwise be covered under this **Liability Coverage** on behalf of such **Insured Person** and will be subrogated to the rights of such **Insured Person** pursuant to section III. CONDITIONS, I. SUBROGATION for purposes of recovering such Retention amount from the **Insured Organization**.

The **Insured Organization's** failure or refusal to indemnify such **Insured Person** will be deemed to have occurred if the **Insured Organization** has neither paid such Retention on behalf of the **Insured Person**, nor acknowledged its obligation to do so, within 60 days of the **Insured Person's** written demand to the **Insured Organization** for indemnification or payment of such Retention.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## CRUCIAL EVENT MANAGEMENT COVERAGE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

   **Crucial Event Management Limit of Liability:**   $ 25,000   for all **Crucial Event Management Loss**, which amount is part of, and not in addition to, the **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable

2. The following is added to section ***II. INSURING AGREEMENTS*** of the **Liability Coverage**:

   **CRUCIAL EVENT MANAGEMENT COVERAGE**

   The Company will pay, on behalf of the **Insured Organization**, **Crucial Event Management Loss** for any **Crucial Event Management Matter** first occurring during the **Policy Period**.

3. The following are added to section ***III. DEFINITIONS*** of the **Liability Coverage**:

   **Crucial Event Management Firm** means any crucial event or crisis management firm or public relations firm hired by the **Insured Organization** with the Company's written consent, which will not be unreasonably withheld, to perform services for an **Insured** to minimize potential harm to the **Insured Organization** arising from a **Crucial Event Management Matter**.

   **Crucial Event Management Loss** means the: reasonable costs, charges, fees, and expenses of the **Crucial Event Management Firm** in connection with the **Crucial Event Management Matter**, incurred subsequent to a **Crucial Event Management Matter**, regardless of whether a **Claim** is made against an **Insured** arising from the **Crucial Event Management Matter** and, in the event a **Claim** is made, regardless of whether the amount is incurred prior to or subsequent to the making of the **Claim**.

   **Crucial Event Management Matter** means:

   1. the death, incapacity or criminal indictment of any **Insured Person** on whom the **Insured Organization** maintains key person life insurance;

   2. a public announcement of the recall of a major product of the **Insured Organization**;

   3. a public announcement or accusation that the **Insured Organization** has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible real estate, including the loss of use thereof;

   4. a public announcement of employee layoffs in excess of **0%** of the **Insured Organization's** total number of employees;

   5. a public announcement that the **Insured Organization** has defaulted or intends to default on its debt;

   6. a public announcement that the **Insured Organization** intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the **Insured Organization**, or that bankruptcy proceedings are imminent, whether voluntary or involuntary; or

---

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

© 2011 The Travelers Indemnity Company. All rights reserved.

7.        a public announcement that governmental or regulatory proceedings are beginning or may begin against the **Insured Organization**;

A **Crucial Event Management Matter** will first begin when an **Executive Officer** becomes aware of the matter, and will conclude when the **Crucial Event Management Firm** advises the **Insured Organization** that such matter no longer exists or when the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations is exhausted.

4.        The following is added to section *III. CONDITIONS*, **C. LIMITS OF LIABILITY** of the Liability Coverage Terms and Conditions:

The Company's maximum limit of liability for all **Crucial Event Management Loss** first made during the **Policy Period** is the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations. Such Crucial Event Management Limit of Liability is part of, and not in addition to, the Directors, Officers, and Organization Limit of Liability under this **Policy**.

5.        The following is added to section *III. CONDITIONS*, **B. RETENTION** of the **Liability Coverage**:

No Retention applies to **Crucial Event Management Loss**.

6.        The following is added to section *III. CONDITIONS* of the Liability Coverage Terms and Conditions:

As a condition precedent to exercising rights under this **Policy**, the **Insured** must give the Company written notice of any **Crucial Event Management Matter** or circumstances that could give rise to a **Crucial Event Management Matter** as soon as practicable after an **Executive Officer** first becomes aware of a **Crucial Event Management Matter**.

As a condition precedent to exercising rights under this **Policy**, the **Insured** must:

1.        include within any notice of a **Crucial Event Management Matter** or circumstance a description of the **Crucial Event Management Matter** or circumstance, the nature of the **Crucial Event Management Matter** or circumstance, the nature of the alleged or potential damage, the names of **Insured Persons** involved, and a description of how the **Insured** first became aware of such **Crucial Event Management Matter** or circumstance; and

2.        give to the Company such other information and cooperation as the Company may reasonably request.

All notices under this section must be sent or delivered to the Company, at the address set forth in ITEM 3 of the Declarations, and will be deemed received and effective upon the earliest of actual receipt by the addressee, or one day following the date such notice is sent.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SECTION 502(c) PENALTIES ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

1. The following is added to ITEM 5 of the Declarations:

    **Section 502(c) Penalties Limit of Liability: $250,000**, which amount is included within, and not in addition to, any applicable limit of liability.

2. The following is added to section **III. *CONDITIONS*, C. LIMITS OF LIABILITY** 1. of the Liability Coverage Terms and Conditions:

    However, the Company's maximum limit of liability for all **Section 502(c) Penalties** will be the Section 502(c) Penalties Limit of Liability set forth in ITEM 5 of the Declarations, which amount is included within, and not in addition to, any applicable limit of liability.

3. The following is added to section **II. *DEFINITIONS*** of the Fiduciary Liability Coverage:

    ***Section 502(c) Penalties*** means civil penalties imposed on any **Insured** pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974, as amended, including such penalties imposed on any **Insured** pursuant to the Pension Protection Act of 2006.

4. The following replaces section **II. *DEFINITIONS*, M** .1. **Loss** of the Fiduciary Liability Coverage:

    1. civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.; **Section 502(c) Penalties**; civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of **HIPAA**; or, in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof); sanctions; liquidated damages; payroll or other taxes; or damages or types of relief deemed uninsurable under applicable law;

5. The following is added to section **III. *EXCLUSIONS*, A.** of the Fiduciary Liability Coverage:

    The Company will not be liable for **Loss** for any **Claim** for **Section 502(c) Penalties** based upon, arising out of, or attributable to any:
    a. facts, transactions or events which are or reasonably would be regarded as a **Wrongful Act** about which any **Insured** had knowledge prior to **December 1, 2016**; or
    b. any **Wrongful Act** occurring or alleged to have occurred, in whole or in part, prior to **December 1, 2016**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**Issuing Company: Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND CANCELLATION CONDITION -- PRO RATA COMPUTATION OF PREMIUM REFUND ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

The following replaces paragraph two of *Section III. CONDITIONS*, **Q**. CANCELLATION:

Subject to the provisions set forth in Section III. CONDITIONS, K. CHANGE OF CONTROL, the **Named Insured** may cancel any **Liability Coverage** by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured** cancels, the Company will refund any unearned premium computed pro rata. Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

© 2012 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## GLOBAL COVERAGE COMPLIANCE ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

1. The following is added to section **II. DEFINITIONS**:

   *Financial Interest* means the **Named Insured's** insurable interest in an **Insured Organization** that is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, as a result of the **Named Insured's**:

   1. ownership of the majority of the outstanding securities or voting rights of such **Insured Organization** representing the present right to elect, appoint, or exercise a majority control over such **Insured Organization's** board of directors, board of trustees, board of managers, natural person general partner, or functional foreign equivalent;

   2. indemnification of, or representation that it has an obligation to indemnify, such **Insured Organization** for **Loss** incurred by such **Insured Organization**; or

   3. election or obligation to obtain insurance for such **Insured Organization**.

2. The following is added to section **III. CONDITIONS**:

   **SANCTIONS**

   This **Liability Policy** will provide coverage, or otherwise will provide any benefit, only to the extent that providing such coverage or benefit does not expose the Company or any of its affiliated or parent companies to any trade or economic sanction under any law or regulation of the United States of America or any other applicable trade or economic sanction, prohibition, or restriction.

3. The following replaces section **III. CONDITIONS, A. TERRITORY**:

   **A. TERRITORY AND VALUATION**

   1. This **Liability Policy** applies anywhere in the world; provided, this **Liability Policy** does not apply to **Loss** incurred by an **Insured**, or a **Foreign Parent Corporation**, residing or domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance, to the extent that providing this insurance would violate the laws or regulations of such country or jurisdiction.

   2. In the event an **Insured Organization** incurs **Loss** referenced in 1. above to which this insurance would have applied, the Company will reimburse the **Named Insured** for its **Loss**, on account of its **Financial Interest** in such **Insured Organization**. As a condition precedent to such reimbursement, or any rights under this **Liability Policy**, the **Named Insured** will cause the **Insured Organization** or its **Insured Persons** to comply with the conditions of this **Liability Policy**.

   3. All premiums, Limits of Liability, Retention, **Loss**, and other amounts under this **Liability Policy** are expressed and payable in the currency of the United States. If a judgment is rendered, settlement is denominated, or another element of **Loss** under this **Liability Policy** is stated in a currency other than United States dollars, payment under this **Liability Policy** will be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the final judgment is reached, the amount of the settlement is agreed upon, or any other element of **Loss** is due, respectively.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2015 The Travelers Indemnity Company. All rights reserved.

4.   The following is added to section **III. CONDITIONS**, **E. CLAIM DEFENSE**:

In the event of a **Claim** against an **Insured** or **Foreign Parent Corporation** that resides or is domiciled in a country or jurisdiction in which the Company is not licensed to provide this insurance and if Duty-to-Defend coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, the Company will have the right and duty to defend such **Claim** as set forth in this section III. CONDITIONS, E. CLAIM DEFENSE, 1. to the extent that doing so would not violate the laws or regulations of such country or jurisdiction.

If the Company is prohibited from defending such **Claim** or if Reimbursement coverage is provided with respect to this **Liability Policy** as indicated in ITEM 7 of the Declarations, then this section III. CONDITIONS, E. CLAIM DEFENSE, 2. applies to such **Claim**; provided, any such **Claim** is subject to section III. CONDITIONS, P. ALLOCATION, 2.

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ARCHITECTURE, ENGINEERING AND RELATED PROFESSIONAL SERVICES EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following is added to section **IV. EXCLUSIONS**, **A**. **EXCLUSIONS APPLICABLE TO ALL LOSS**:

The Company will not be liable for **Loss** for any **Claim** based upon or arising out of the actual or alleged rendering of, or failure to render, the following professional services for others: architectural, engineering, land surveying, landscape architectural, construction management, scientific, technical consulting or planning.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

### AMEND CHANGE OF CONTROL AND EXTENDED REPORTING PERIOD CONDITIONS ENDORSEMENT

This endorsement changes the following:

**It is agreed that:**

1. The following replaces the first paragraph of section **III. CONDITIONS**, **K. CHANGE OF CONTROL**:

   If, during the **Policy Period**, a **Change of Control** occurs, coverage will continue in full force and effect with respect to **Loss** arising out of a **Claim** or that part of a **Claim** alleging **Wrongful Acts** committed before the **Change of Control**; coverage will cease with respect to **Loss** arising out of a **Claim** or that part of a **Claim** alleging **Wrongful Acts** committed after the **Change of Control**. After such **Change of Control**, the **Liability Policy** may not be canceled by the **Named Insured** and the entire premium for the **Liability Policy** will be deemed fully earned.

2. The second and fifth paragraphs of section **III. CONDITIONS**, **K. CHANGE OF CONTROL** are amended by deleting "wholly."

3. The first paragraph of section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD** is amended by deleting "wholly."

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2015 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## EXTRADITION COVERAGE ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

1. The following is added to section **III. DEFINITIONS**, **A. Claim** of the **Liability Coverage**:

   **Claim** also means a request for **Extradition**.

2. The following is added to section **II. DEFINITIONS**, **F. Defense Expenses** of the Liability Coverage Terms and Conditions:

   **Defense Expenses** also means **Extradition Expenses**.

3. The following is added to section **III. DEFINITIONS** of the **Liability Coverage**:

   *Extradition* means a formal process by which an **Insured Person** located in any country is surrendered, or sought to be surrendered, to any other country to answer any criminal accusation, including the execution of an arrest warrant where such execution is an element of such process.

   *Extradition Expenses* means the reasonable legal fees and expenses incurred by an **Insured Person** in lawfully opposing, challenging, resisting, or defending against any request for, or any effort to obtain, the **Extradition** of such **Insured Person**.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company:    **Travelers Casualty and Surety Company of America**

Policy Number:    **106639043**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## NEW JERSEY CHANGES ENDORSEMENT

This endorsement changes the following:

**Liability Coverage Terms and Conditions**

**It is agreed that:**

The following replaces section **III. CONDITIONS**, **O. EXTENDED REPORTING PERIOD**, of the Liability Terms and Conditions:

**O.     EXTENDED REPORTING PERIOD**

Upon termination or cancellation of any **Liability Coverage** for any reason other than nonpayment of premium, the **Named Insured** will have the right to an Automatic Extended Reporting Period and an Extended Reporting Period, as follows:

1.      Automatic Extended Reporting Period

The **Named Insured** will be provided an automatic extension of the coverage granted by such **Liability Coverage** for the period of 30 days following the effective date of termination or cancellation of any **Liability Coverage**, herein called the Automatic Extended Reporting Period, for **Claims** made against persons or entities who at the effective date of termination or cancellation of any **Liability Coverage** were **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of termination or cancellation of any **Liability Coverage** and which otherwise would be covered by such **Liability Coverage**. This Automatic Extended Reporting Period will be deemed a part of, and not in addition to, any Extended Reporting Period purchased by the **Named Insured** as described below.

The Automatic Extended Reporting Period will not provide a new, additional, or renewed limit of liability. The limit of liability applicable to all **Claims** made during such Automatic Extended Reporting Period will be only the remaining portion of the applicable limit of liability on the effective date of termination or cancellation of any **Liability Coverage**.

2.      Extended Reporting Period

At any time prior to or within 60 days after the effective date of termination or cancellation of any **Liability Coverage** for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period offered by the Company. Such offering will include a period of 36 months for all **Liability Coverages** that are part of this **Liability Policy**, following the effective date of termination or cancellation of any **Liability Coverage**, regarding **Claims** made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancellation of any **Liability Coverage** are **Insureds**, but only for **Wrongful Acts** occurring wholly prior to the effective date of termination or cancellation of any **Liability Coverage** and which would otherwise be covered by such **Liability Coverage**, subject to the following provisions:

a.      such Extended Reporting Period will not provide a new, additional, or renewed limit(s) of liability; and

b.      the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of termination or cancellation of any **Liability Coverage**.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2012 The Travelers Indemnity Company. All rights reserved.

The premium due for the Extended Reporting Period will equal the percentage set forth in ITEM 8 of the Declarations of the annualized premium of the applicable **Liability Coverage**, including the fully annualized amount of any additional premiums charged by the Company during the **Policy Year** prior to such termination or cancellation. The entire premium for the Extended Reporting Period will be deemed to have been fully earned at the commencement of such Extended Reporting Period.

The right to elect the Extended Reporting Period will terminate unless written notice of such election, together with payment of the additional premium due, is received by the Company within 60 days of the effective date of termination or cancellation of any **Liability Coverage**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2012 The Travelers Indemnity Company. All rights reserved.



**PRIVATE COMPANY DIRECTORS AND OFFICERS LIABILITY**

***THIS IS A CLAIMS-MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ THE POLICY CAREFULLY.***

## I.       INSURING  AGREEMENTS

The Company will pay on behalf of:

**A.**       the **Insured Persons, Loss** for **Wrongful Acts**, except for **Loss** which the **Insured Organization** pays to or on behalf of the  **Insured Persons**  as indemnification;

**B.**       the **Insured Organization, Loss** for **Wrongful Acts** which the **Insured Organization** pays to or on behalf of the **Insured Persons** as indemnification; and

**C.**        the **Insured Organization, Loss** for **Wrongful Acts**,

resulting from any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

The Company will also pay on behalf of the **Insured Organization, Investigation Expense** resulting from any **Security Holder Derivative Demand** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, against an **Insured Organization** for **Wrongful Acts**.  The Company's maximum limit of liability for all **Investigation Expense** will be the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

## II.       SUPPLEMENTAL PERSONAL INDEMNIFICATION

If ITEM 5 of the Declarations indicates that coverage for Supplemental Personal Indemnification Coverage has been purchased, and if the **Liability Coverage Limit of Liability** under this **Liability Coverage** or a **Liability Coverage Shared Limit of Liability**, if applicable, has been exhausted, the Company will provide the **Insured Persons** with an additional Supplemental Personal Indemnification Limit of Liability under Insuring Agreement A. Such Supplemental Personal Indemnification Limit of Liability will not exceed the amount set forth in ITEM 5 of the Declarations, which amount is in addition to and not part of the **Liability Coverage Limit of Liability** or **Liability Coverage Shared Limit of Liability**, if applicable. This Supplemental Personal Indemnification Limit of Liability applies solely to **Loss**  resulting from any **Claim,**  other than a **Claim** for an employment-related **Wrongful Act,** against an **Insured Person** to which Insuring Agreement A. is applicable.

## III.       DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in this Section III. DEFINITIONS:

**A.**       *Claim* means:

1.       a written demand, other than a **Security Holder Derivative Demand**, for monetary damages or non-monetary relief;

2.       a civil proceeding commenced by service of a complaint or similar pleading;

3.       a criminal proceeding commenced by filing of charges;

4.       a formal administrative or regulatory proceeding, commenced by a filing of charges, formal investigative order, service of summons, or similar document;

5.       an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

6.    a **Security Holder Derivative Demand** solely with respect to **Investigation Expenses** and subject to the **Investigation Expense Limit of Liability** set forth in ITEM 5 of the Declarations;

7.    the service of a subpoena on an **Insured Person** identified by name if served upon such person pursuant to a formal administrative or regulatory proceeding, or

8.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an **Insured** for a **Wrongful Act**, provided that **Claim** does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim.** However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim.**

**B.**    *Executive Officer* means the chairperson, chief executive officer, president, chief financial officer, in-house general counsel, or **LLC Manager** of the **Insured Organization** or a functional equivalent thereof.

**C.**    *Insured* means the **Insured Persons** and the **Insured Organization**.

**D.**    *Insured Organization* means the **Named Insured,** any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**E.**    *Insured Person* means any natural person who was, is or becomes a duly elected or appointed member of the board of directors, officer, or a functional equivalent to a member of the board of directors or officer of the **Insured Organization** in the event the **Insured Organization** is incorporated or domiciled outside the United States, member of the board of managers, **Executive Officer**, employee, or member of a management committee or an advisory committee of the **Insured Organization**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**F.**    *Investigation Expense* means reasonable and necessary fees, costs and expenses incurred by the **Insured Organization**, including its board of directors, board of managers or any duly constituted committee thereof, in connection with any investigation or evaluation by the **Insured Organization** of any **Security Holder Derivative Demand**.

**G.**    *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements, judgments, back and front pay, compensatory damages, punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages, prejudgment and postjudgment interest, and legal fees and expenses awarded pursuant to a court order or judgment. **Loss** does not include:

1.    civil or criminal fines, sanctions, liquidated damages other than liquidated damages awarded under the Age Discrimination in Employment Act or the Equal Pay Act, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; or

2.    any amount allocated to non-covered loss pursuant to Section III. CONDITIONS. P. ALLOCATION of the Liability Coverage Terms and Conditions.

**H.**    *Outside Entity* means a corporation or organization:

1.    other than the **Insured Organization**, which is exempt from federal income tax as an entity described in Section 501(c)(3), 501(c)(4), or 501(c)(10) of the Internal Revenue Code of 1986, as amended; or

2.    specifically scheduled as an **Outside Entity** by endorsement to this **Liability Policy**.

**I.**   *Outside Position* means service by an **Insured Person** as a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof with an **Outside Entity**, but only during such time that such service is with the knowledge, consent, and at the specific request of the **Insured Organization**.

**J.**   *Security Holder Derivative Claim* means any **Claim** brought on behalf of, or in the name or right of, the **Insured Organization** by one or more security holders of the **Insured Organization** in their capacity(ies) as such, but only if such **Claim** is brought and maintained without the assistance, participation or solicitation of any member of the board of directors, officer, member of the board of managers, or a functional equivalent thereof.

**K.**   *Security Holder Derivative Demand* means a written demand by one or more security holders of the **Insured Organization** in their capacity(ies) as such to bring a civil proceeding in a court of law on behalf of, or in the name or right of, the **Insured Organization** against any **Insured Person** for a **Wrongful Act** by an **Insured Person**, but only if such demand is asserted without the assistance, participation or solicitation of any member of the board of directors, officer, member of the board of managers, or a functional equivalent thereof.

**L.**   *Subsidiary* means:

1.   any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

2.   any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

3.   any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

4.   subject to the provisions set forth in Section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**M.**   *Wrongful Act* means:

1.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her capacity as such;

2.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an **Insured Person** in his or her **Outside Position**;

3.   any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the **Insured Organization**; or

4.   any matter asserted against an **Insured Person** solely by reason of his or her status as such.

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

©2009 The Travelers Companies, Inc. All Rights Reserved

## IV.   EXCLUSIONS

**A.   EXCLUSIONS APPLICABLE TO ALL LOSS**

1.   The Company will not be liable for **Loss** for any **Claim** for any damage to, destruction of, loss of, or loss of use of any tangible property including damage to, destruction of, loss of, or loss of use of tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2.   The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, humiliation, loss of reputation, libel, slander, oral or written publication of defamatory or disparaging material, or invasion of privacy; provided that this exclusion will not apply to:

   a.   any **Claim** for emotional distress, mental anguish, or humiliation with respect to any employment related **Wrongful Act**; or

   b.   any **Security Holder Derivative Claim**.

3.   The **Company** will not be liable for **Loss** for any **Claim**:

   a.   based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

   b.   based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**; or

   c.   brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**,

   provided this exclusion does not apply to any **Security Holder Derivative Claim**.

4.   The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding, including audits initiated by the Office of Federal Contract Compliance Programs, against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

5.   The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation, or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

6.   The Company will not be liable for **Loss** for any **Claim** based upon or arising out of, any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

7.   The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation or for any violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA) (except the Equal Pay Act), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

8.   The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under the Employee Retirement Income Security Act of 1974 (ERISA), including

amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation; or for an **Insured's** failure or refusal to establish, contribute to, pay for, insure, maintain, provide benefits pursuant to, or enroll or maintain the enrollment of an employee or dependent in, any employee benefit plan, fund or program, including contracts or agreements which are not subject to the provisions of ERISA.

9.　　The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Insured**; provided that this exclusion will not apply to:

　　a.　　any **Security Holder Derivative Claim** or any **Security Holder Derivative Demand**;

　　b.　　any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Liability Coverage**;

　　c.　　any **Claim** brought by a receiver, liquidator, bankruptcy trustee or similar official of the **Insured Organization**;

　　d.　　any **Claim** brought or maintained by a natural person who was a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof, but who has not served in such capacity for at least four (4) years preceding the date the **Claim** is first made; and who brings and maintains the Claim without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made;

　　e.　　any **Claim** for an employment related Wrongful Act brought by an employee; or

　　f.　　any **Claim** brought by an employee for a **Wrongful Act** in connection with an offer, purchase or sale of securities if:

　　　　i.　　the employee brings the **Claim** solely in his or her capacity as a security holder of the **Insured Organization** without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made; and

　　　　ii.　　the employee is not a member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof and has not served in such capacity during the four (4) year period immediately preceding the date the **Claim** is first made.

10.　　The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such **Outside Entity**; provided that this exclusion will not apply to any **Claim** brought derivatively by a security holder of such **Outside Entity** in his or her capacity as such.

11.　　The Company will not be liable for **Loss** for any **Claim** based upon or arising out of:

　　a.　　the public offer, sale, solicitation or distribution of securities issued by the **Insured Organization**; or

　　b.　　the violation of any federal, state, local or provincial statute relating to securities, including the Securities Act of 1933 and the Securities and Exchange Act of 1934, or any rules or regulations promulgated thereunder.

provided that this exclusion will not apply to any offer, purchase or sale of securities, whether debt or equity, in a transaction that is exempt from registration under the Securities Act of 1933 (an "Exempt Transaction").

In addition, if at least thirty (30) days prior to an offering of securities of the **Insured Organization**, other than pursuant to an Exempt Transaction, the Company receives notice of the proposed transaction and any additional information requested by the Company, the **Insured Organization** may request a proposal for coverage subject to any additional terms and conditions, and payment of any additional premium, described in such proposal.

12.　　The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by an entity that is, or was a **Subsidiary**, or any **Insured Person** of such entity, occurring at any time during which such entity was not a **Subsidiary**.

13.     The Company will not be liable for **Loss** for any **Claim,** with respect to Insuring Agreement C. only:

    a.     for any plagiarism;

    b.     for any misappropriation, infringement or violation of copyright, patent, trademark, service mark, trade name, trade secret or any other intellectual property rights;

    c.     based upon or arising out of any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

    d.     based upon or arising out of any employment related **Wrongful Act**; or

    e.     for any liability of the **Insured Organization** under any express contract or agreement. For the purposes of this exclusion, an express contract or agreement is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making.

**B.     EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.     The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

    a.     committing any intentionally dishonest or fraudulent act or omission;

    b.     committing any willful violation of any statute, rule or law; or

    c.     gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

    provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, or willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

2.     The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations thereunder, or any related or similar federal, state or local law or regulation.

---

## *V.     SEVERABILITY OF EXCLUSIONS*

No conduct of any **Insured Person** will be imputed to any other **Insured Person** to determine the application of any of the exclusions set forth in Section IV. EXCLUSIONS above.  Solely with respect to exclusion B.1. set forth above, no conduct of any **Insured** will be imputed to any other **Insured** to determine if coverage is available.

---

## *VI.     CONDITIONS*

**A.     RETENTION**

This Section VI. CONDITIONS A. RETENTION will supplement, and not replace, Section III. CONDITIONS B. RETENTION of the Liability Coverage Terms and Conditions.

No retention will apply to **Defense Expenses** resulting from any **Claim**, other than a **Claim** for an employment related **Wrongful Act**, and the Company will reimburse the **Insured Organization** for any such retention paid by the **Insured Organization** in connection with any such **Claim**, if:

1.     with respect to such **Claim**, there is a final adjudication of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals, or a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals; or

---

2. such **Claim** is dismissed or there is a stipulation to dismiss such **Claim** with prejudice and without the payment of any monetary consideration by the **Insureds**.

In no event will a settlement of a **Claim** be considered a final adjudication of no liability for purposes of this subsection.

As a condition of any reimbursement of the retention as set forth above, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of such amounts in the event that such **Claim** is reinstituted after payment by the Company.

**B.    SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** will refuse to consent to such Settlement Offer, the **Insured** will be solely responsible for thirty percent (30%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the  **Insured**  refused to consent to the Settlement Offer, and the  **Insured**  will also be responsible for thirty percent (30%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this  **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

**C.    PRESUMPTION OF INDEMNIFICATION**

Regardless of whether **Loss** resulting from any **Claim** against **Insured Persons** is actually indemnified, Insuring Agreement B. and the Retention set forth in the Declarations will apply to any  **Loss**  as to which indemnification by the **Insured Organization** or any **Outside Entity** is legally permissible, whether or not actual indemnification is made, unless such indemnification is not made by the **Insured Organization** or such **Outside Entity** solely by reason of its **Financial Insolvency**.

The certificate of incorporation, charter, articles of association or other organizational documents of the **Insured Organization** and each **Outside Entity**, including by-laws and resolutions, will be deemed to have been adopted or amended to provide indemnification to the **Insured Person**s to the fullest extent permitted by law.

**D.    OTHER  INSURANCE AND INDEMNIFICATION**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with: (1) any other valid and collectible insurance available to any **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**; or (2) indemnification to which an  **Insured Person**  is entitled from any **Outside Entity** other than the **Insured Organization**.  This **Liability Coverage** will not be subject to the terms of any other insurance.

**E.    OUTSIDE POSITIONS – LIMIT OF LIABILITY**

If any **Claim** against the **Insureds** gives rise to an obligation both under this **Liability Coverage** and under any other coverage or policy of insurance issued by the Company or any of its affiliates to any **Outside Entity**, the Company's maximum aggregate limit of liability under all such policies for all **Loss**, including **Defense Expenses**, for such **Claim** will not exceed the largest single available limit of liability under any such coverage.

**F.    ORDER OF PAYMENTS**

If **Loss,**  other than **Defense Expenses,**  from any **Claim** exceeds the remaining applicable limit of liability as set forth in ITEM 5 of the Declarations:

1. the Company will first pay **Loss** for such **Claim** to which Insuring Agreement A. applies; then
2. to the extent that any amount of the applicable limit of liability will remain available, the Company will pay **Loss** for such **Claim** to which Insuring Agreements B. and C. apply.

Upon written request of the **Insured Organization** by and through any **Executive Officer**, the Company will either pay or withhold payment of **Loss** from such **Claim** under Insuring Agreements B. and C., as applicable.   In the event of a written request to withhold payment, the Company will make any future payment only for **Loss** from any such **Claim** to which Insuring Agreement A. applies, unless otherwise so instructed upon written request by and through an **Executive Officer** of the **Insured Organization**.

| THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY. |
|---|

## AMEND DEFINITION OF INSURED PERSONS TO INCLUDE ADVISORY BOARD MEMBERS ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following is added to section **III. DEFINTIONS, E. Insured Person** of the **Liability Coverage:**

**Insured Person** also means any natural person who was, is, or becomes a duly elected or appointed member of an advisory board of the **Insured Organization**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

---
**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**
---

## DELETE COVERAGE FOR EMPLOYMENT RELATED WRONGFUL ACTS ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

1.  The following replaces section **III. DEFINITIONS, G. Loss,** 1. of the **Liability Coverage:**

    [ **Loss** does not include:]

    civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; or

2.  The following replaces section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS,** 4. of the **Liability Coverage:**

    The Company will not be liable for **Loss** for any **Claim** based on or arising out of any fact, circumstance, situation, event, or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

3.  The following replaces section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS,** 7. of the **Liability Coverage:**

    The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation or for any violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

4.  Section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS,** 2., a., 9., e.. and 13., d. of the **Liability Coverage** are deleted.

5.  The following replaces section **VI. CONDITIONS, A. RETENTION** of the **Liability Coverage:**

    This section **VI. CONDITIONS, A. RETENTION** will supplement, and not replace section **III. CONDITIONS, B. RETENTION** of the Liability Coverage Terms and Conditions.

    No retention will apply to **Defense Expenses** resulting from any **Claim** and the Company will reimburse the **Insured Organization** for any such retention paid by the **Insured Organization** in connection with any such **Claim**, if:

    1.  with respect to such **Claim**, there is a final judgment of no liability obtained prior to or during trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment or any similar motion or process, after exhaustion of all appeals, or a final judgment of no liability obtained after trial, in favor of all **Insureds**, after exhaustion of all appeals; or

    2.  such **Claim** is dismissed or there is a stipulation to dismiss such **Claim** with prejudice and without the payment of any monetary consideration by the **Insureds**.

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106639043

In no event will a settlement of a **Claim** be considered a final judgment of no liability for purposes of this subsection.

As a condition of any reimbursement of the retention as set forth above, the Company may require a written undertaking on terms and conditions satisfactory to the Company guaranteeing the repayment of such amounts in the event that such **Claim** is reinstituted after payment by the Company.

6. The following is added to section **IV. EXCLUSIONS, A. EXCLUSION APPLICABLE TO ALL LOSS** of the **Liability Coverage:**

The Company will not be liable for Loss for any **Claim** based on or arising out of any employment related **Wrongful Act** .

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## EXPRESS CONTRACT EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following replaces section **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 13., e.:

13. The Company will not be liable for **Loss** for any **Claim,** with respect to Insuring Agreement C. only:

    e. for any liability of the **Insured Organization** under any express contract or agreement, except to the extent that the **Insured Organization** would have been liable in the absence of such express contract or agreement. For the purposes of this exclusion, an express contract or agreement is an actual agreement among the contracting parties, the terms of which are openly stated in distinct or explicit language, either orally or in writing, at the time of its making.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2012 The Travelers Indemnity Company.  All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND SECTION IV. EXCLUSIONS, B. 1. - FINAL NON-APPEALABLE ADJUDICATION IN ANY PROCEEDING OTHER THAN A PROCEEDING INITIATED BY THE COMPANY ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following replaces section *IV. EXCLUSIONS*, **B. EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**, 1., of the **Liability Coverage**:

1.      The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

   a.      committing any intentionally dishonest or fraudulent act or omission;

   b.      committing any willful violation of any statute, rule, law; or

   c.      gaining any profit, remuneration or financial advantage to which such **Insured** was not legally entitled;

   provided that this exclusion will not apply unless a final non-appealable adjudication in any proceeding other than a proceeding initiated by the Company establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

PDO-19032 Ed. 11-12                                                                                                          Page 1 of 1
© 2012 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMEND DEFINITION OF OUTSIDE ENTITY TO INCLUDE ANY NON-PROFIT OR SPECIFIED OUTSIDE ENTITY ENDORSEMENT

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section **III. DEFINITIONS**, **H. Outside Entity**:

H.      **Outside Entity** means any corporation or organization:

1.      other than the **Insured Organization**, that is a non-profit entity; or

2.      any Specified Outside Entity as set forth in the Specified Outside Entity schedule below.

**Specified Outside Entity**

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

Issuing Company:   **Travelers Casualty and Surety Company of America**
Policy Number:        **106639043**

---

© 2013 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## AMEND PRODUCT EXCLUSION ENDORSEMENT – SECURITY HOLDER CLAIM CARVEBACK

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section 13., c. of **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

13.      The Company will not be liable for **Loss** for any **Claim**, with respect to Insuring Agreement C only:

c.      based upon or arising out of any malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy, or dangerous condition in such product or in its design or manufacture; provided that this exclusion will not apply to any **Claim** brought by one or more security holders of the **Insured Organization** in their capacity as such;

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

---

© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## AMEND INSURED VERSUS INSURED AND OUTSIDE ENTITY EXCLUSIONS ENDORSEMENT – WHISTLEBLOWER ACTIVITY CLARIFICATION; CARVEBACKS FOR CREDITOR COMMITTEES, FORMER DIRECTORS AND EMPLOYEES, AND CLAIMS BROUGHT OUTSIDE THE UNITED STATES

This endorsement changes the following:

**Private Company Directors and Officers Liability**

It is agreed that:

1. The following is added to section **III. DEFINITIONS**:

   ***Whistleblower Activity*** means activity protected under any whistleblower protection provision of any applicable federal, state, local or foreign securities law or regulation that affords protection to a natural person, other than the filing of a proceeding, causing a proceeding to be filed, or any other activity that is engaged in on a voluntary basis.

2. The following replaces section 9. of **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

   9.  The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Insured**; provided that this exclusion will not apply to:

       a.  any **Security Holder Derivative Claim** or any **Security Holder Derivative Demand**; provided that if any **Insured Person** engages in any **Whistleblower Activity**, such activity alone will not be considered to be brought, maintained or asserted with the solicitation, assistance or participation of any member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof;

       b.  any **Claim** in the form of a crossclaim, third party claim or other claim for contribution or indemnity by an **Insured Person** and which is part of or results directly from a **Claim** which is not otherwise excluded by the terms of this **Liability Coverage**;

       c.  any **Claim** brought by a receiver, liquidator, bankruptcy trustee, member of a creditors' committee, or similar official of the **Insured Organization**;

       d.  any **Claim** brought or maintained by a natural person who was a member of the board of directors, officer, member of the board of trustees, member of the board of managers, or a functional equivalent thereof, but who has not served in such a capacity for at least the number of years set forth in the Specified Number of Years of Director, Officer or Trustee Service schedule below, preceding the date the **Claim** is first made; and who brings and maintains the **Claim** without the solicitation, assistance or participation of any current member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such a capacity during the period of years set forth in the Specified Number of Years of Director, Officer or Trustee Service schedule below, immediately preceding the date the **Claim** is first made;

       e.  any **Claim** for an employment related **Wrongful Act** brought by an employee;

       f.  any **Claim** brought by an employee for a **Wrongful Act** in connection with an offer, purchase or sale of securities if:

           i.  the employee brings the **Claim** solely in his or her capacity as a security holder of the **Insured Organization** without the solicitation, assistance or participation of any current

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof or anyone who has served in such capacity during the period of years set forth in the Specified Number of Years of Employed Service schedule below, immediately preceding the date the **Claim** is first made; and

ii. the employee is not a member of the board of directors, officer, member of the board of trustees, board of managers, or a functional equivalent thereof and has not served in such capacity during the period of years set forth in the Specified Number of Years of Employed Service schedule below, immediately preceding the date the **Claim** is first made;

g. any **Claim** brought or maintained by any **Insured Person**, if such **Insured Person** is required to bring such **Claim** under any applicable code, regulation or statute of any jurisdiction outside the United States.

3. The following replaces section 10. of **IV. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**:

10. The Company will not be liable for **Loss** for any **Claim** by or on behalf of, or in the name or right of, any **Outside Entity** against an **Insured Person** for a **Wrongful Act** in his or her **Outside Position** with respect to such **Outside Entity**; provided that this exclusion will not apply to:

a. any **Claim** brought derivatively by a security holder of such **Outside Entity** in his or her capacity as such; or

b. any **Claim** brought by a receiver, liquidator, bankruptcy trustee or similar official of the **Outside Entity**.

**Specified Number of Years of Director, Officer or Trustee Service: 3**


**Specified Number of Years of Employed Service: 3**

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2014 The Travelers Indemnity Company. All rights reserved.

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

**AMEND LOSS DEFINITION TO INCLUDE COVERAGE CARVEBACKS FOR LIQUIDATED DAMAGES UNDER THE AGE DISCRIMINATION IN EMPLOYMENT, EQUAL PAY, AND FAMILY MEDICAL LEAVE ACTS, AND CIVIL PENALTIES UNDER THE FOREIGN CORRUPT PRACTICES ACT ENDORSEMENT**

This endorsement changes the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following replaces section **III. DEFINITIONS**, **G. Loss**, 1.:

1.  civil or criminal fines, sanctions, liquidated damages, payroll or other taxes, or damages, penalties or types of relief deemed uninsurable under applicable law; provided, **Loss** includes:

    a.  liquidated damages awarded under the Age Discrimination in Employment Act, the Equal Pay Act, or the Family Medical Leave Act;

    b.  civil penalties assessed against any **Insured Person** pursuant to the Foreign Corrupt Practices Act of 1977 §§ 15 U.S.C. 78dd-2(g)(2)(B) and 78ff(c)(2)(B) and the United Kingdom Bribery Act of 2010 (Eng.) § 11(1)(a), to the extent that the violations of such laws are neither intentional nor willful; or

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company:      **Travelers Casualty and Surety Company of America**

Policy Number:      **106639043**

PDO-19018 Rev. 05-17                                                                                          Page 1 of 1
© 2017 The Travelers Indemnity Company. All rights reserved.



**FIDUCIARY LIABILITY**

*THIS IS A CLAIMS MADE COVERAGE WITH DEFENSE EXPENSES INCLUDED IN THE LIMIT OF LIABILITY. PLEASE READ ALL TERMS CAREFULLY.*

## I.    INSURING AGREEMENTS

**A.**    The Company will pay on behalf of the **Insured**, **Loss** for any **Claim** first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Act**.

**B.**    The Company will pay on behalf of the **Insured**, **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice**; provided that participation by the **Insured** in any **Settlement Program** commences during the **Policy Period** or, if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

## II.    DEFINITIONS

Wherever appearing in this **Liability Coverage**, the following words and phrases appearing in bold type will have the meanings set forth in this section II. DEFINITIONS:

**A.**    *Administration* means**:**

1.    giving counsel, advice, or notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Benefits**;

2.    interpreting **Employee Benefits**;

3.    handling records in connection with **Employee Benefits**; or

4.    effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Benefits**  program.

**B.**    *Claim* means**:**

1.    a written demand for monetary damages or non-monetary relief;

2.    a civil proceeding commenced by service of a complaint or similar pleading;

3.    a criminal proceeding commenced by filing of charges;

4.    a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons or similar document, including a fact-finding investigation by the Department of Labor, the Pension Benefit Guaranty Corporation, or a similar government agency that is located outside of the United States, including, in the United Kingdom, the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, or any successor body thereto;

5.    an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld; or

6.    a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an **Insured** for a **Wrongful Act**.

A **Claim** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives

written notice of a **Claim** during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

**C.**     *Employee Benefits* means benefits provided through an **Employee Benefit Plan** or a **Multiemployer Plan,** and also includes benefits provided under workers' compensation insurance, unemployment insurance, Social Security, disability insurance, and the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA") and amendments thereto.

**D.**     *Employee Benefit Plan* means**:**

   1.     any **Welfare Plan** which was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**;

   2.     any **Pension Plan**, including an **Employee Stock Ownership Plan**, which was, or is, sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization** and which existed on or before the Inception Date set forth in ITEM 2 of the Declarations;

   3.     any group or group-type insurance program, including a Health Savings Account (HSA) program, that meets the safe harbor conditions set forth in 29 C.F.R. 2510.3-1(j)(1), or any benefit plan that is not subject to Title I of **ERISA**, including any fringe benefit or excess benefit plan, that was, is now, or becomes sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; or

   4.     any **Pension Plan** for which coverage is provided pursuant to section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN of this **Liability Coverage.**

**E.**     *Employee Stock Ownership Plan* means any plan so defined in Section 407(d)(6)(A) of ERISA, or any similar or related federal, state or local law or regulation.

**F.**     *ERISA* means the Employee Retirement Income Security Act of 1974, including amendments thereto and regulations promulgated thereunder or any similar common or statutory law.

**G.**     *ESOP Administration* means**:**

   1.     giving notice to employees of the **Insured Organization**, participants, or beneficiaries with respect to **Employee Stock Ownership Plan** benefits;

   2.     interpreting **Employee Stock Ownership Plan** benefits;

   3.     handling records in connection with **Employee Stock Ownership Plan** benefits; or

   4.     effecting enrollment, termination or cancellation of employees of the **Insured Organization**, participants, or beneficiaries under an **Employee Stock Ownership Plan**.

**H.**     *Executive Officer* means a member of the board of directors or governors, officer, member of the board of trustees, natural person general partner, principal, risk manager, **LLC Manager**, in-house general counsel of the **Insured Organization** or a functional equivalent thereof.  **Executive Officer** also includes any natural person trustee of any **Employee Benefit Plan**.

**I.**     *HIPAA* means the Health Insurance Portability and Accountability Act of 1996, as amended.

**J.**     *Insured* means the **Insured Persons**, the **Insured Organization**, and any **Employee Benefit Plan.**

**K.**     *Insured Organization* means the **Named Insured**, any **Subsidiary**, and any such entity as a debtor in possession, as such term is used in Chapter 11 of the United States of America Bankruptcy Code, as amended, or the equivalent of a debtor in possession under any applicable foreign law.

**L.**     *Insured Person* means any natural person who was, is now or becomes a  trustee, member  of  the board of directors or governors, management committee member, general partner, officer, **LLC Manager**, in-house general counsel, member of an **Employee Benefit Plan** committee, or employee of the **Insured Organization** or of an **Employee Benefit Plan**, while acting in his or her capacity as a fiduciary of an **Employee Benefit Plan** or as a person performing **Administration** or **ESOP Administration**.

In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

**M.**    *Loss* means **Defense Expenses** and money which an **Insured** is legally obligated to pay as a result of a **Claim**, including settlements; judgments; back and front pay; compensatory damages; punitive or exemplary damages or the multiple portion of any multiplied damage award if insurable under the applicable law most favorable to the insurability of punitive, exemplary, or multiplied damages; prejudgment and post judgment interest; and legal fees and expenses awarded pursuant to a court order or judgment; and solely with respect to section I. INSURING AGREEMENTS B. of this **Liability Coverage**, **Settlement Fees**. **Loss** does not include:

1.    civil or criminal fines (except **Settlement Fees** pursuant to Insuring Agreement B.; civil penalties under Sections 502(i) and 502(l) of **ERISA** or the privacy provisions of **HIPAA**; or, in the United Kingdom, civil penalties imposed by the Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, Pensions Regulator, or any successor body thereto, provided that the funds or assets of the pension scheme will not be used to fund, pay or reimburse the premium for this coverage or any portion thereof); sanctions; liquidated damages; payroll or other taxes; or damages or types of relief deemed uninsurable under applicable law;

2.    payment of medical benefits, pension benefits, severance, or **Employee Benefits** which are or may become due, except to the extent that such sums are payable as a personal obligation of an **Insured Person**, because of such **Insured Person's Wrongful Act**; provided that this exclusion will not apply to:

   a.    the Company's obligation to defend any **Claim**, if applicable, or to pay, advance or reimburse **Defense Expenses**, regarding a **Claim** seeking such benefits; or

   b.    that portion of any damage, settlement or judgment covered as **Loss** under this **Liability Coverage** that represents a loss to any **Employee Benefit Plan**, or loss to any account of a participant in any **Employee Benefit Plan**, by reason of a change in value of any investments held by such **Employee Benefit Plan** or such account, including investments in the securities of the **Insured Organization**, notwithstanding that such portion of any such damage, settlement or judgment has been characterized by plaintiffs, or held by a court of law, to be "benefits"; or

3.    any amount allocated to non-covered loss pursuant to section III. CONDITIONS P. ALLOCATION of the Liability Coverage Terms and Conditions.

**N.**    *Multiemployer Plan* means a **Pension Plan** or **Welfare Plan** maintained pursuant to one or more collective bargaining agreements to which the **Insured Organization** and at least one other employer is required to contribute.

**O.**    *Pension Plan* means any plan so defined in Section 3(2) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**P.**    *Settlement Fees* mean any fees, penalties or sanctions imposed by law under a **Settlement Program** that any **Insured** becomes legally obligated to pay as a result of a **Wrongful Act**. **Settlement Fees** will not include any costs or expenses other than such fees, penalties or sanctions.

**Q.**    *Settlement Program* means any voluntary compliance resolution program or similar voluntary settlement program, administered by the Internal Revenue Service or Department of Labor of the United States, including the Employee Plans Compliance Resolution System, the Self Correction Program, the Audit Closing Agreement Plan, the Delinquent Filer Voluntary Compliance program, and the Voluntary Fiduciary Correction program, entered into by the **Insured Organization**.

**R.**    *Settlement Program Notice* means a prior written notice to the Company by the **Insured** of the **Insured's** intent to enter into a **Settlement Program**.

**S.**    ***Subsidiary*** means**:**

    1.    any corporation, partnership, limited liability company or other entity organized under the laws of any jurisdiction in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent;

    2.    any non-profit entity over which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** has the ability to exercise managerial control;

    3.    any entity operated as a joint venture, in which, on or before the Inception Date set forth in ITEM 2 of the Declarations, the **Named Insured** owns, directly or indirectly, exactly 50% of the issued and outstanding voting stock and whose management and operation the **Insured Organization** solely controls, pursuant to a written agreement with the owner(s) of the remaining issued and outstanding voting stock; or

    4.    subject to the provisions set forth in section III. CONDITIONS L. ACQUISITIONS of the Liability Coverage Terms and Conditions, any entity that the **Insured Organization** acquires or forms during the **Policy Period** in which the **Named Insured** owns, directly or indirectly, more than 50% of the outstanding securities or voting rights representing the present right to elect, appoint or exercise a majority control over such entity's board of directors, board of trustees, board of managers, natural person general partners, or functional equivalent, or, in the case of any non-profit entity that does not issue securities, over which the **Named Insured** has the ability to exercise managerial control.

**T.**    ***Welfare Plan*** means any plan so defined in Section 3(1) of ERISA or any similar or related federal, state, local, or foreign law or regulation.

**U.**    ***Workplace Misconduct*** means**:**

    1.    any actual or alleged failure or refusal to hire or employ an applicant for employment with the **Insured Organization**;

    2.    any actual or alleged termination or constructive termination of an employment relationship with the **Insured Organization**;

    3.    any actual or alleged demotion of, refusal to train or promote an employee of the **Insured Organization**;

    4.    any other act or omission by which an **Insured** allegedly treats one employee of the **Insured Organization** differently from another in compensation, terms, conditions, opportunities or privileges of employment, including acts or practices taken for the purpose of or which have the impact of distinguishing among, limiting, segregating or classifying employees of the **Insured Organization** or applicants for employment with the **Insured Organization** in their compensation terms, conditions, opportunities or privileges of employment on any of the following grounds: race, color, national origin, religion, creed, gender, sexual orientation, pregnancy, disability, medical condition, age, marital status, Vietnam Era Veteran status, military service, or any other legally protected category, status or characteristic established pursuant to federal, state or other law, regulation or ordinance, including Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act, the Older Workers Benefit Protection Act, the Uniformed Services Employment and Reemployment Rights Act of 1994, the Americans With Disabilities Act or the Family Medical Leave Act;

    5.    any adverse employment action with regard to an employee of the **Insured Organization** on account of such employee's exercise or attempted exercise of rights protected by law, including the Family Medical Leave Act, or on account of the employee of the **Insured Organization** having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law; or

    6.    any actual or constructive termination of an employment relationship with the **Insured Organization** in a manner or for a reason which is contrary to applicable law or in violation of a written, oral or implied agreement, other than a collective bargaining agreement, for continued employment.

©2009 The Travelers Companies, Inc. All Rights Reserved

**V.** *Wrongful Act* means**:**

1. any actual or alleged breach of fiduciary duty by or on behalf of the **Insured** with respect to any **Employee Benefit Plan**, including:

   a. any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA,** COBRA, **HIPAA,** or by any similar or related federal, state, local, or foreign law or regulation, in the discharge of the **Insured's** duties with respect to an **Employee Benefit Plan**; or

   b. any other matter claimed against an **Insured** solely because of the **Insured's** status as a fiduciary of an **Employee Benefit Plan**; or

2. any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **Administration** of **Employee Benefits.**

All **Related Wrongful Acts** are a single **Wrongful Act** for purposes of this **Liability Coverage**, and all **Related Wrongful Acts** will be deemed to have occurred at the time the first of such **Related Wrongful Acts** occurred whether prior to or during the **Policy Period**.

---

## III.   EXCLUSIONS

**A.   EXCLUSIONS APPLICABLE TO ALL LOSS**

1. The Company will not be liable for **Loss** for any **Claim** for any damage to, or destruction of, loss of, or loss of use of, any tangible property including damage to, destruction of, loss of, or loss of use of, tangible property that results from inadequate or insufficient protection from soil or ground water movement, soil subsidence, mold, toxic mold, spores, mildew, fungus, or wet or dry rot.

2. The Company will not be liable for **Loss** for any **Claim** for any bodily injury, sickness, disease, death, loss of consortium, emotional distress, mental anguish, or humiliation.

3. The Company will not be liable for **Loss** for any **Claim**:

   a. based upon or arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of any **Pollutant**;

   b. based upon or arising out of any request, demand, order, or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, any **Pollutant**, or

   c. brought by or on behalf of any governmental authority because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, any **Pollutant**;

   provided this exclusion will not apply to any **Claim** by or on behalf of a beneficiary of, or participant in, any **Employee Benefit Plan** based upon, arising from or in consequence of the diminution in value of any securities owned by the **Employee Benefit Plan** in any organization, other than the **Insured Organization**, if such diminution in value is allegedly as a result of a **Pollutant**.

4. The Company will not be liable for **Loss** for any **Claim** for any liability of others assumed by an **Insured** under any contract or agreement, whether oral or written, other than an **Employee Benefit Plan**, except to the extent that the **Insured** would have been liable in the absence of such contract or agreement.

5. The Company will not be liable for **Loss** for any **Claim** for any violation of responsibilities, duties or obligations under any law concerning Social Security, unemployment insurance, workers' compensation, disability insurance, or any similar or related federal, state or local law or regulation, or for any actual or alleged violation of the Worker Adjustment and Retraining Notification Act (WARN), Occupational Safety and Health Act (OSHA), the National Labor Relations Act (NLRA), Fair Labor Standards Act (FLSA), or amendments thereto or regulations promulgated thereunder, or any similar or related federal, state or local law or regulation other than COBRA, **HIPAA** or **ERISA**.

©2009 The Travelers Companies, Inc. All Rights Reserved

6.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event or **Wrongful Act** underlying or alleged in any prior or pending civil, criminal, administrative or regulatory proceeding against any **Insured** as of or prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

7.  The Company will not be liable for **Loss** for any **Claim** for any fact, circumstance, situation or event that is or reasonably would be regarded as the basis for a claim about which any **Executive Officer** had knowledge prior to the applicable Continuity Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

8.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any fact, circumstance, situation, event, or **Wrongful Act** which, before the Inception Date set forth in ITEM 2 of the Declarations, was the subject of any notice of claim or potential claim given by or on behalf of any **Insured** under any policy of insurance of which this **Liability Coverage** is a direct renewal or replacement or which it succeeds in time.

9.  The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Workplace Misconduct**, other than **Claims** asserted under **ERISA**.

**B.    EXCLUSIONS APPLICABLE TO LOSS, OTHER THAN DEFENSE EXPENSES**

1.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** based upon or arising out of any **Insured**:

    a.    committing any intentionally dishonest or fraudulent act or omission;

    b.    committing any willful violation of any statute, rule, law; or

    c.    gaining any profit, remuneration or advantage to which such **Insured** was not legally entitled;

    provided that this exclusion will not apply unless a final adjudication establishes that such **Insured** committed such intentionally dishonest or fraudulent act or omission, willful violation of any statute, rule or law, or gained such profit, remuneration or advantage to which such **Insured** was not legally entitled.

2.  The Company will not be liable for **Loss**, other than **Defense Expenses**, for any **Claim** seeking costs and expenses incurred or to be incurred to comply with an order, judgment or award of injunctive or other equitable relief of any kind, or that portion of a settlement encompassing injunctive or other equitable relief, including actual or anticipated costs and expenses associated with or arising from an **Insured's** obligation to provide reasonable accommodation under, or otherwise comply with, the Americans With Disabilities Act or the Rehabilitation Act of 1973, including amendments thereto and regulations promulgated thereunder, or any similar or related federal, state or local law or regulation.

**C.    EXCLUSIONS APPLICABLE TO INSURING AGREEMENT B**

The Company will pay no **Settlement Fees** or **Defense Expenses** with respect to any **Claim** or investigation in connection with a **Settlement Program**, of which any **Insured** first became aware or received notice prior to the applicable Prior and Pending Proceeding Date set forth in ITEM 5 of the Declarations for this **Liability Coverage**.

---

**IV.    *SEVERABILITY OF EXCLUSIONS***

No conduct of any **Insured** will be imputed to any other **Insured** to determine the application of any of the exclusions set forth in section III. EXCLUSIONS above.

---

## V.    CONDITIONS

### A.    SETTLEMENT

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for 30% of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for 30% of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

### B.    ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN

If, during the **Policy Period**, the **Insured Organization** acquires or forms an **Employee Benefit Plan**, which is then solely sponsored by the **Insured Organization** exclusively for the benefit of the employees of the **Insured Organization**, this **Liability Coverage** will provide coverage for that acquired or formed **Employee Benefit Plan** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Coverage**, but only for **Claims** for **Wrongful Acts** which occur wholly during the time that the **Insured Organization** is sole sponsor with regard to the **Employee Benefit Plan**, provided written notice of such acquisition or formation has been given to the Company, and specific application has been submitted on the Company's form in use at the time, together with such documentation and information as the Company's underwriters may require, all within 90 days after the effective date of such acquisition or formation.  Coverage for the acquired or formed **Employee Benefit Plan** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

The 90-day notice requirement and the 90-day limitation of coverage will not apply, provided that: (1) the total assets of the acquired or formed **Employee Benefit Plan**, as of the effective date of such acquisition or formation, do not exceed 30% of the total plan assets shown on the most recent **Application** submitted by the **Insured Organization**, or (2) the acquisition or formation occurs fewer than 90 days prior to the end of the **Policy Period**.

Notwithstanding the foregoing, if such acquired or formed **Employee Benefit Plan** is an **Employee Stock Ownership Plan** that is not part of, and is separate from, any other **Pension Plan**, the coverage provided pursuant to this section V. CONDITIONS B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN to such **Employee Stock Ownership Plan** will be limited to any actual or alleged negligent act, error or omission by or on behalf of the **Insured** in the **ESOP Administration** of **Employee Benefits**.

### C.    MERGER OF PLANS

If, during the **Policy Period**, an **Employee Benefit Plan** is merged with another **Employee Benefit Plan**, this **Liability Coverage** will continue to provide coverage for both plans, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

If, during the **Policy Period**, an **Employee Benefit Plan** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Liability Coverage** ("Uncovered Plan"), this **Liability Coverage** will continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**, but only for **Claims** for **Wrongful Acts** which occurred prior to the date of such merger.

**D.**     **SALE OF PLAN**

If, prior to or during the **Policy Period**, any **Employee Benefit Plan** is sold, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**. The coverage provided pursuant to this section V. CONDITIONS D. SALE OF PLAN will apply only:

1.     for **Claims** for **Wrongful Acts** which occurred prior to the date of such sale;

2.     while such plan was sponsored solely by the **Insured Organization** exclusively for the benefit of employees of the **Insured Organization**; and

3.     if notice of such sale is given to the Company prior to the end of such **Policy Period**.

**E**     **TERMINATION OF PLAN**

If before or during the **Policy Period** any **Employee Benefit Plan** is terminated, this **Liability Coverage** will provide coverage for such plan, subject to all other terms, conditions and limitations of this **Liability Coverage** for so long as this **Liability Coverage** remains in effect as to the **Named Insured**.

**F.**     **OTHER  INSURANCE**

This **Liability Coverage** will apply only as excess insurance over, and will not contribute with any other valid and collectible insurance available to the **Insured**, including any insurance under which there is a duty to defend, unless such insurance is written specifically excess of this **Liability Coverage** by reference in such other policy to the Policy Number of this **Liability Policy**.  This **Liability Coverage** will not be subject to the terms of any other insurance.

**G.**     **ORDER OF PAYMENTS**

If **Loss**, other than **Defense Expenses**, from any **Claim** exceeds the remaining applicable limit of liability as set forth in ITEM 5 of the Declarations:

1.     the Company will first pay such **Loss** for such **Claim** for which the **Insured Organization** is not permitted by law to indemnify any **Insured Person**, or is permitted or required to indemnify such **Insured Person** but does not do so by reason of **Financial Insolvency**; then

2.     to the extent that any amount of the applicable limit of liability remains available, the Company will pay such **Loss** for such **Claim** incurred by the **Insured Organization** directly or through indemnification.

Upon written request of the **Insured Organization** by and through any **Executive Officer**, the Company will either pay or withhold payment of **Loss** from such **Claim** pursuant to the order of payments set forth herein, as applicable. In the event of a written request to withhold payment, the Company will make any future payment only for unindemnified **Loss** from any such **Claim** as specified in 1. above, unless otherwise so instructed upon written request by and through an **Executive Officer** of the **Insured Organization**.

**H.**     **SETTLEMENT PROGRAM LIMIT OF LIABILITY AND RETENTION**

The Company's maximum limit of liability for all **Settlement Fees** and **Defense Expenses** in connection with a **Settlement Program Notice** will be the amount set forth in ITEM 5 of the Declarations as the Settlement Program Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.  However, if ITEM 5 of the Declarations indicates that Additional Defense Coverage is applicable, **Defense Expenses** incurred in connection with a **Settlement Program Notice** will apply first to and reduce the remaining **Additional Defense Limit of Liability**; provided that the Settlement Program Limit of Liability will be reduced and may be exhausted by payment of such **Defense Expenses** under the **Additional Defense Limit of Liability**.

**Settlement Fees** and **Defense Expenses** incurred with respect to a **Settlement Program Notice** will be subject to the applicable Retention set forth in ITEM 5 of the Declarations.  If a **Claim** results in a **Settlement Program Notice**, the applicable Retentions will be applied separately to such **Claim** and **Settlement Program Notice**, respectively, but the sum of such Retentions will not exceed the largest of such Retentions.

I.  **SETTLEMENT PROGRAM EXTENDED REPORTING PERIOD AND RUN-OFF EXTENDED REPORTING PERIOD**

1. The Extended Reporting Period described in section III. CONDITIONS O. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of such termination or nonrenewal.

2. The Run-Off Extended Reporting Period described in section III. CONDITIONS K. of the Liability Coverage Terms and Conditions, if purchased, will apply only to **Settlement Fees** and **Defense Expenses** incurred by the **Insured** in connection with any **Settlement Program Notice** as a result of the **Insured's** participation during the Run-Off Extended Reporting Period in a **Settlement Program**, but only if such participation commences during the Run-Off Extended Reporting Period and involves an **Employee Benefit Plan's** actual or alleged inadvertent noncompliance with any statute, rule or regulation before the effective date of the **Change of Control.**

J.  **HIPAA LIMIT OF LIABILITY**

The Company's maximum limit of liability for all civil money penalties under the privacy provisions of **HIPAA** will be the amount set forth in ITEM 5 of the Declarations as the HIPAA Limit of Liability, which amount is included within, and not in addition to, any applicable limit of liability.

K.  **INSURED'S DUTIES IN THE EVENT OF A SETTLEMENT PROGRAM NOTICE**

All **Settlement Program Notices** must be sent by mail or prepaid express courier to the address set forth in ITEM 3 of the Declarations and will be effective upon receipt. The **Insured** will not enter into a **Settlement Program** or incur any **Defense Expenses** in connection with a **Settlement Program Notice** or **Settlement Fees** without the Company's prior written consent, such consent not to be unreasonably withheld. The Company will not be liable for any such **Defense Expenses** or **Settlement Fees** to which it has not consented.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## DELETE WORKPLACE MISCONDUCT EXCLUSION ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

**It is agreed that:**

The following is deleted from section ***III. EXCLUSIONS***, **A**. **EXCLUSIONS APPLICABLE TO ALL LOSS, 10**.

10. The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Workplace Misconduct**, other than **Claims** asserted under **ERISA**.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above- mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SETTLOR ACT CLAIMS ENDORSEMENT – AMEND DEFINITION OF INSURED PERSON TO INCLUDE FOREIGN EQUIVALENTS

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1.     The following replaces section **II. DEFINITIONS**, **L. Insured Person**:

   **L.**     ***Insured Person*** means any natural person who was, is now, or becomes a trustee, member of the board of directors or governors, management committee member, general partner, officer, **LLC Manager**, in-house general counsel, member of an **Employee Benefit Plan** committee, or employee of the **Insured Organization** or of an **Employee Benefit Plan**, or, with respect to an **Insured Organization** incorporated outside of the United States, their functional equivalent, while acting in his or her capacity as a fiduciary or settlor of an **Employee Benefit Plan** or as a person performing **Administration** or **ESOP Administration**.

   In the event of the death, incapacity or bankruptcy of an **Insured Person**, any **Claim** against the estate, heirs, legal representatives or assigns of such **Insured Person** for a **Wrongful Act** of such **Insured Person** will be deemed to be a **Claim** against such **Insured Person**.

2.     The following is added to section **II. DEFINITIONS**, **V. Wrongful Act**:

   **Wrongful Act** also means any actual or alleged breach of duties, obligations and responsibilities imposed by **ERISA**, COBRA, or **HIPAA**, or by similar or related federal, state, local, or foreign law or regulation, in the discharge of the **Insured's** duties in a settlor capacity with respect to an **Employee Benefit Plan**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

---

© 2013 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## HEALTHCARE EXCHANGE ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1.      The following is added to **II. DEFINITIONS**, **C. Employee Benefits**:

        **Employee Benefits** also means benefits available to employees of the **Insured Organization** through a **Healthcare Exchange**.

2.      The following is added to **II. DEFINITIONS**:

        *Healthcare Exchange* means any public, private, or government sponsored entity established to facilitate the purchase of health insurance in accordance with the Patient Protection and Affordable Care Act.

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2014 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

BENEFIT DETERMINATION APPEALS AND PRELIMINARY INVESTIGATIONS ENDORSEMENT

This endorsement changes the following:

**Fiduciary Liability**

---

**It is agreed that:**

1. The following replaces section **I. INSURING AGREEMENTS**, **A.**:

   The Company will pay on behalf of the **Insured**, **Loss** for:

   1. any **Claim**, other than a **Preliminary Investigation**, first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, for a **Wrongful Act**; or

   2. any **Preliminary Investigation**, first made during the **Policy Period**, or if exercised, during the Extended Reporting Period or Run-Off Extended reporting Period.

2. The following replaces section **II. DEFINITIONS**, **B.**:

   *Claim* means:

   1. a written demand for monetary damages or non-monetary relief;

   2. a civil proceeding commenced by service of a complaint or similar pleading;

   3. a criminal proceeding commenced by filing of charges;

   4. a formal administrative or regulatory proceeding commenced by filing of a notice of charges, formal investigative order, service of summons, or similar document;

   5. an arbitration, mediation or similar alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;

   6. a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding; or

   7. a **Benefit Determination Appeal**;

   against an **Insured** for a **Wrongful Act**; or

   8. a **Preliminary Investigation**.

   A **Claim** , other than a **Preliminary Investigation**, is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Claim**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Claim**, during the **Policy Period**, but no **Executive Officer** receives written notice of such **Claim** until after the **Policy Period** has expired, then such **Claim** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

   If an **Insured** elects coverage for a **Preliminary Investigation**, such **Preliminary Investigation** is deemed to be made on the earliest date that any **Executive Officer** first receives written notice of such **Preliminary**

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

© 2015 The Travelers Indemnity Company. All rights reserved.

**Investigation**. However, if any **Insured Person** who is not an **Executive Officer** first receives written notice of a **Preliminary Investigation**, during the **Policy Period**, but no **Executive Officer** receives written notice of such **Preliminary Investigation** until after the **Policy Period** has expired, then such **Preliminary Investigation** will be deemed to have been made on the date such **Insured Person** first received written notice of the **Claim**.

3.  The following is added to section **II. DEFINITIONS**:

*Benefit Determination Appeal* means a written appeal made by an employee, participant, or beneficiary of an adverse benefit determination by an **Insured** with respect to an **Employee Benefit Plan** pursuant to the Department of Labor's claim procedure regulation 29 C.F.R. § 2560.503-1(h) or a similar claim procedure pursuant to applicable law.

*Preliminary Investigation* means any:

1.  fact-finding investigation of an Insured; or

2.  request for an interview with an **Insured Person**,

solely as respects any **Employee Benefit Plan**, whether or not a **Wrongful Act** is alleged; commenced in writing by the United States Department of Labor, Pension Benefit Guaranty Corporation, or a similar government agency located outside of the United States, including the United Kingdom Pensions Ombudsmen appointed by the Secretary of State for Social Services or by the Occupational Pensions Regulatory Authority, or any successor body thereto.

**Preliminary Investigation** does not include any routine or regularly scheduled regulatory or internal supervision, inspection, compliance, review, examination, production, or audit.

*Related Preliminary Investigations* mean all **Preliminary Investigations** that have as a common nexus, or are causally connected by reason of, any fact, circumstance, situation, event, or decision.

4.  The following is added to the first paragraph of section **III. CONDITIONS**, **F. INSURED'S DUTIES IN THE EVENT OF A CLAIM** of the Liability Coverage Terms and Conditions:

Provided that, if an **Executive Officer** elects coverage for a **Preliminary Investigation**, such **Executive Officer** must give the Company written notice of the **Preliminary Investigation** as soon as practicable after such **Executive Officer** first becomes aware of such **Preliminary Investigation**, but no later than: (i) 90 days after the Expiration Date of the **Policy Period** set forth in ITEM 2 of the Declarations; or (ii) the expiration of any applicable **Extended Reporting Period** or **Run-Off Extended Reporting Period**.

If an **Executive Officer** elects coverage for a **Preliminary Investigation**, such **Executive Officer** must: (i) include with any notice of a **Preliminary Investigation** the name of the agency making the request and, to the best of the **Executive Officer's** knowledge, a description of the nature and subject matter identified by the agency in the **Preliminary Investigation**; and (ii) provide to the Company such other information and cooperation as the Company may reasonably request, including additional information about the subject matter and nature of the **Preliminary Investigation** as it is learned.

5.  The following is added to section **III. CONDITIONS**, **K. CHANGE OF CONTROL** of the Liability Coverage Terms and Conditions:

If, during the **Policy Period**, a **Change of Control** occurs, then coverage for **Preliminary Investigations** under this **Liability Coverage** will continue, but only for any **Preliminary Investigations** based upon facts or circumstances occurring prior to the **Change of Control**.

6.  The following replaces the first paragraph of section **III. CONDITIONS** , **O. EXTENDED REPORTING PERIOD** of the Liability Coverage Terms and Conditions:

At any time prior to or within 60 days after the effective date of termination or cancelation of any **Liability Coverage** for any reason other than nonpayment of premium, the **Named Insured** may give the Company written notice that it desires to purchase an Extended Reporting Period for the period set forth in ITEM 8 of the

© 2015 The Travelers Indemnity Company. All rights reserved.

Declarations following the effective date of such termination or cancelation, regarding **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, made during such Extended Reporting Period against persons or entities who at or prior to the effective date of termination or cancelation are **Insureds**, but only for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, occurring prior to the effective date of such termination or cancelation and which otherwise would be covered by such **Liability Coverage**, subject to the following provisions: (i) such Extended Reporting Period will not provide new, additional, or renewed limits of liability; and (ii) the Company's maximum limit of liability for all **Claims** made during such Extended Reporting Period will be only the remaining portion of the applicable limit of liability set forth in the Declarations as of the effective date of the termination or cancelation;

7. The following is added to section **III. CONDITIONS**, **H. RELATED CLAIMS** of the Liability Coverage Terms and Conditions:

**RELATED PRELIMINARY INVESTIGATIONS**

All **Related Preliminary Investigations** are deemed one **Preliminary Investigation**, and such **Preliminary Investigation** is deemed to be first made on the date the earliest of such **Preliminary Investigations** is first made, regardless of whether such date is before or during the **Policy Period**.

Any **Claim** arising out of the same or substantially similar facts or circumstances as a **Preliminary Investigation**, for which notice has been provided pursuant to section III. CONDITIONS, F. INSURED'S DUTIES IN THE EVENT OF A CLAIM, 2., Notice of Preliminary Investigation, will be deemed to be first made on the date such **Preliminary Investigation** is first made, regardless of whether such date is before or during the **Policy Period**.

8. The following replaces section **III. EXCLUSIONS**, **A. EXCLUSIONS APPLICABLE TO ALL LOSS**, 9.:

The Company will not be liable for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act**, or **Preliminary Investigations** based upon facts or circumstances, by a **Subsidiary** or any related **Insured Person** occurring at any time during which such entity was not a **Subsidiary**.

9. The following replaces the first paragraph of section **V. CONDITIONS**, **B. ACQUISITION OR FORMATION OF AN EMPLOYEE BENEFIT PLAN** of the **Liability Coverage**:

If, during the **Policy Period**, the **Insured Organization** acquires or forms an **Employee Benefit Plan**, that is solely sponsored by the **Insured Organization** exclusively for the benefit of its employees, then this **Liability Coverage** will provide coverage for such **Employee Benefit Plan** and its respective **Insured Persons**, subject to all other terms and conditions of this **Liability Coverage**, but only for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances, that occur when the **Insured Organization** is the sole sponsor with regard to the **Employee Benefit Plan**; provided written notice of such acquisition or formation has been given to the Company, and specific application submitted on the Company's form in use at the time, together with any documentation and information as the Company may require, all within 90 days after the effective date of such acquisition or formation. Coverage for the acquired or formed **Employee Benefit Plan** will not be afforded following such 90-day period unless the Company has agreed to provide such coverage, subject to any additional terms and conditions as the Company may require, and the **Named Insured** has paid the Company any additional premium as may be required by the Company.

10. The following replaces the second paragraph of section **V. CONDITIONS**, **C. MERGER OF PLANS** of the **Liability Coverage**:

If, during the **Policy Period**, an **Employee Benefit Plan** ("Covered Plan") is merged with another **Welfare Plan** or **Pension Plan** for which coverage is not provided under this **Liability Coverage** ("Uncovered Plan"), then this **Liability Coverage** will continue to provide coverage for only the Covered Plan, subject to all other terms and conditions of this **Liability Coverage** and only for so long as this **Liability Coverage** remains in effect as to the **Named Insured**, but only for **Claims** for **Wrongful Acts**, or for **Preliminary Investigations** based upon facts or circumstances which occurred prior to the date of such merger.

© 2015 The Travelers Indemnity Company. All rights reserved.

11.  The following replaces section 1. of **V. CONDITIONS**, **D. SALE OF PLAN** of the **Liability Coverage**:

for **Claims** for **Wrongful Acts**, or **Preliminary Investigations** based upon facts or circumstances which occurred prior to the date of such sale;

---

Nothing herein contained shall be held to vary, alter, waive, or extend any of the terms, conditions, exclusions, or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

© 2015 The Travelers Indemnity Company. All rights reserved.

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## PRIOR ACTS EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability, Fiduciary Liability**

**It is agreed that:**

The following is added to **EXCLUSIONS APPLICABLE TO ALL LOSS:**

The Company will have no liability for **Loss** for any **Claim** based upon or arising out of any **Wrongful Act** committed or alleged to have been committed, in whole or in part, prior to the applicable Retroactive Date set forth below.

| Liability Coverage | Retroactive Date |
| --- | --- |
| **Private Company Directors and Officers Liability** | **12/01/2016** |
| **Fiduciary Liability** | **12/01/2016** |

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

## ABSOLUTE PRODUCT LIABILITY EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following is added to **EXCLUSIONS APPLICABLE TO ALL LOSS:**

The Company will have no liability for **Loss** for any **Claim** based upon or arising out of the efficacy, performance, health or safety standard or proprietary or licensing rights of any products, technologies or services manufactured, produced, processed, packaged, sold, marketed, distributed, advertised, developed, endorsed, recommended, sponsored or reviewed by the **Insured Organization**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

LIA-7017 Ed. 01-09 Printed in U.S.A.                                                                                    Page 1 of 1
©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITION OF OWNERSHIP PERCENTAGE EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

---

**It is agreed that:**

The following is added to section **IV. EXCLUSIONS, A. EXCLUSIONS APPLICABLE TO ALL LOSS** of the **Liability Coverage:**

The Company will not be liable for **Loss** for any **Claim** brought or maintained by  or on  behalf  of,  or with the assistance, participation, or solicitation of any person or entity that owns or did own more than   **5%** of the **Named Insured**.

---

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the  above-mentioned  policy,  except  as  expressly  stated  herein.   This  endorsement  is  part  of  such  policy  and incorporated therein.

---

Issuing Company: **Travelers Casualty and Surety Company of America**

Policy Number: **106639043**

---

LIA-7301 Ed. 01-09 Printed in U.S.A.
©2009 The Travelers Companies, Inc. All Rights Reserved

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ADDITION OF SPECIFIED MAJOR PARTY EXCLUSION ENDORSEMENT

This endorsement modifies the following:

**Private Company Directors and Officers Liability**

**It is agreed that:**

The following is added to section **IV. EXCLUSIONS, EXCLUSIONS APPLICABLE TO ALL LOSS** of the **Liability Coverage:**

The Company will not be liable for **Loss** for any **Claim** brought or maintained by or on behalf of, in the name or right of, as assignee of, or with the solicitation, assistance, participation, or intervention of any person or Specified Major Party as set forth in the Specified Major Party scheduled below or, with respect to any Specified Major Party, any subsidiary, affiliate,or general or limited partner, if any, of such entity, any director, officer, trustee, employee, security holder, receiver, conservator, liquidator, or rehabilitator of such entity or of any of its subsidiaries, affiliates or general or limited partners.

**Specified Major Party**

**Cornerstone Capital, LLC**

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions,exclusions or limitations of the above-mentioned policy, except as expressly stated herein.  This endorsement is part of such policy and incorporated therein.

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106639043

---

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

---

## SETTLEMENT CONDITION ENDORSEMENT

This endorsement modifies the following when indicated below by ☒:

---

**It is agreed that:**

☐   **Private Company Directors and Officers Liability**

The following replaces **B. SETTLEMENT** of the *CONDITIONS* section of the **Liability Coverage**:

**B.**    **SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

☐   **Financial Institution Professional Liability**

The following replaces **B. SETTLEMENT** of the *CONDITIONS* section of the **Liability Coverage**:

**B.**    **SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient.  In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** does not exceed the remaining applicable limit of liability.

☐   **Employment Practices Liability**

The following replaces section *IV. CONDITIONS*, **A. SETTLEMENT** of the **Liability Coverage**:

**A.**    **SETTLEMENT**

    1.    The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that:

        a.    the **Insured** and the party bringing a **Claim** hereunder consent to the first settlement offer recommended by the Company (the "Settlement Offer") within thirty (30) days of being made aware of such offer by the Company; and

---

Issuing Company: Travelers Casualty and Surety Company of America
Policy Number: 106639043

      b.    the amount of such Settlement Offer:

          i.    is less than the remaining applicable limit of liability available at the time; and

          ii.    combined with **Defense Expenses** incurred with respect to such **Claim**, exceeds the Retention;

the Retention will be retroactively reduced by ten percent (10%) with respect to such **Claim**.

2.    If the **Insured** does not consent to the Settlement Offer within thirty (30) days of being made aware of such offer by the Company:

    a.    the Retention will not be reduced as provided in paragraph 1. above even if consent is given to the same or subsequent Settlement Offer; and

    b.    the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss** , other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

[X]  **Fiduciary Liability**

The following replaces section *V. CONDITIONS*, **A. SETTLEMENT** of the **Liability Coverage**:

**A.**     **SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement of any **Claim** which is acceptable to the claimant(s) (a "Settlement Offer"), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

[ ]  **Miscellaneous Professional Liability**

The following replaces section *V. CONDITIONS*, **B. SETTLEMENT** of the **Liability Coverage**:

**B.**     **SETTLEMENT**

The Company may, with the written consent of the **Insured**, make such settlement or compromise of any **Claim** as the Company deems expedient. In the event that the Company recommends an offer of settlement (a "Settlement Offer") of any **Claim** which is acceptable to the claimant(s), and if the **Insured** refuses to consent to such Settlement Offer, the **Insured** will be solely responsible for twenty percent (20%) of all **Defense Expenses** incurred or paid by the **Insured** after the date the **Insured** refused to consent to the Settlement Offer, and the **Insured** will also be responsible for twenty percent (20%) of all **Loss**, other than **Defense Expenses**, in excess of the Settlement Offer, provided that the Company's liability under this **Liability Coverage** for such **Claim** will not exceed the remaining applicable limit of liability.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein. This endorsement is part of such policy and incorporated therein.

---

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

---

## NEW JERSEY CANCELLATION AND NONRENEWAL ENDORSEMENT

This endorsement modifies insurance provided under the following if applicable:

**Liability Policy**
**Kidnap and Ransom Policy**
**Identity Fraud Expense Reimbursement Policy**

---

**It is agreed that:**

The CANCELLATION section of this policy is replaced by the following:

CANCELLATION

The Company may cancel this policy for failure to pay a premium when due, in which case
**(twenty) (20)** days (number of days must equal or exceed twenty (20) days) written notice
shall be given to the **Named Insured or Insurance Representative**, unless payment in full is received within twenty (20) days of the **Named Insured or Insurance Representative's** receipt of such notice of cancellation. The Company shall have the right to the premium amount for the  portion of the **Policy Period** during which this policy was in effect.

Subject to the provisions set forth in Liability Coverage Terms and Conditions Section III. CONDITIONS K. CHANGE OF CONTROL, if applicable, the **Named Insured or Insurance Representative** may cancel any coverage by mailing the Company written notice stating when, thereafter, not later than the Expiration Date set forth in ITEM 2 of the Declarations, such cancellation will be effective. In the event the **Named Insured or Insurance Representative** cancels, the earned premium will be computed in accordance with the customary short rate table and procedure.  Premium adjustment may be made either at the time cancellation is effective or as soon as practicable after cancellation becomes effective, but payment or tender of unearned premium is not a condition of cancellation.

The Company will not be required to renew this policy upon its expiration. If the Company elects not to renew, it will provide to the **Named Insured or Insurance Representative** written notice to that effect
**(thirty) (30)** days (number of days must equal or exceed thirty (30) days) but no more than
one hundred-twenty (120) days before the  Expiration Date set forth in ITEM 2 of the Declarations.

The Company may nonrenew for any underwriting reason in the Company's underwriting guidelines which were in effect at the inception of the original policy or any renewal. The underwriting guidelines must not be arbitrary, capricious or unfairly discriminatory. The Department of Insurance has approved the following guidelines for use on nonrenewals:

(a)   Moral  hazard;
(b)   Averse loss experience;
(c)   Nonpayment of premium;
(d)   Material misrepresentation or nondisclosure of material fact;
(e)   Increased hazard or material change in the risk which could not have been reasonably contemplated by the parties at inception of coverage;
(f)   Substantial breaches of policy provisions that materially affect the nature and/or insurability of the risk;
(g)   Lack of cooperation on loss control matters which materially affect insurability;
(h)   Fraudulent acts against the Company which materially affect the risk;
(i)   Loss of or reduction in available insurance capacity;
(j)   Material increase in exposure arising from changes in statutory or case law;

---

Issuing Company: **Travelers Casualty and Surety Company of America**
Policy Number: **106639043**

---

(k)     Loss or change in reinsurance;

(l)     Failure of the **Named Insured or Insurance Representative** to provide reasonable and necessary underwriting information to the Company upon written request and a reasonable time to respond;

(m)     Agency termination.

All cancellation and nonrenewal notices will be mailed. Notice must be mailed by certified mail or documented by a date-stamped proof of mailing from the Post Office department that shows the name and address of the insured. The Company will retain a duplicate copy of the mailed cancellation or nonrenewal notice.

Nothing herein contained shall be held to vary, alter, waive or extend any of the terms, conditions, exclusions or limitations of the above-mentioned policy, except as expressly stated herein.   This endorsement is part of such policy and incorporated therein.

©2009 The Travelers Companies, Inc. All Rights Reserved

# EXHIBIT B

AO 93 - DNJ (Rev. 3/15) Search and Seizure Warrant

# United States District Court
### for the
## District of New Jersey

| | | |
|---|---|---|
| In the Matter of the Search of | : | |
| *(Briefly describe the property to be searched or identify the person)* | : | |
| THE PREMISES LOCATED AT 17-01 POLLITT DRIVE, | : | Case No.  18-7199 |
| FAIR LAWN, NEW JERSEY 07410 | : | |
| | : | **SEARCH AND SEIZURE WARRANT** |
| | : | |

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of New Jersey *(identify the person or describe the property to be searched and give its location):*

See Attachment A-1

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachment B-1

**YOU ARE COMMANDED** to execute this warrant on or before *Oct. 2, 298*   *(not to exceed 14 days)*

☐ in the daytime, 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Honorable Cathy L. Waldor _____ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *9/18/18   5:08 pm*        _____
*Judge's signature*

City and state:   Newark, New Jersey          Hon. Cathy L. Waldor, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-1

### PREMISES TO BE SEARCHED

#### 17-01 Pollitt Drive, Fair Lawn, New Jersey 07410

The Subject Premises is (the "Subject Premises"), is located at 17-01 Pollitt Drive, Fair Lawn, New Jersey 07410. At the front of the property is a sign with the words "17-01 Pollitt Drive" and five business names listed under the address, including U.S. Technologies. The property has a large brick building with a driveway running the length of the building on the left and a grass area along the right. The entrances for all five businesses are on the left driveway facing-side of the building. U.S. Technologies is located midpoint on the driveway/building, after ChemiSys and Kyodo USA, but before Semperit. U.S. Technologies has a loading dock with roll up garage door located to the left of a human entry double-door located at the top of a handicap ramp. There is a set of two windows on either side of the double-entry door. Signage stating, "UST U.S. Technologies" in blue is mounted to the brick wall. The blue awning over the double door states "U.S. Technologies" in white text. Both entry doors state "U.S. Technologies" in white print on the glass. The parking spaces in front of the U.S. Technologies offices have "UST" in yellow stenciled in the parking spaces.





## ATTACHMENT B-1

1.    Authority is sought to search the premises identified in Attachment A-1 for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371 (the "Specified Federal Offenses"), including the following, from January 2013 to the present:

a.    All Radio Frequency Monitor Boards ("RFMB")/circuit card assemblies ("CCA"), including microelectronic devices related to the production of RFMBs/CCAs;

b.    All purchase orders relating to RFMBs/CCAs;

c.    All invoices, inventory records, and product specification records for RFMBs/CCAs;

d.    All Original Equipment Manufacturer/authorized reseller documents related to RFMBs/CCAs;

e.    All shipping records, including import, delivery, and receiving records for RFMBs/CCAs;

f.    All correspondence, including e-mails, regarding RFMBs/ CCAs.

g.    All quality assurance records regarding RFMBs/CCAs;

h.    All certification documents, including Certificates of Conformance for RFMBs/CCAs;

i.    All contracts and related documents regarding RFMBs/ CCAs;

j.    All accounting and financial records pertaining to RFMB/ CCA contracts;

k.    All records, in whatever form, of personal and business activities, including tax records, relating to the operation and ownership of the business conducted at the Subject Premises.

- 1 -

l.    Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

m.    Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

n.    Records or other items which evidence, ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.    evidence of the lack of such malicious software;

d.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.    evidence of the times the COMPUTER was used;

g.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

      h.    documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      i.    records of or information about Internet Protocol addresses used by the COMPUTER;

      j.    records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

      k.    contextual information necessary to understand the evidence described in this attachment.

    3.    In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

      a.    any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

      b.    any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium.

    4.    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

5.      During the execution of the search of the Subject Premises described in Attachment A-1, law enforcement personnel are authorized to press the fingers (including thumbs) of the individuals found in the Subject Premises to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found in the Subject Premises for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

# EXHIBIT C

AO 93 - DNJ (Rev. 3/15) Search and Seizure Warrant

# United States District Court
### for the
## District of New Jersey

| | |
|---|---|
| In the Matter of the Search of | : |
| *(Briefly describe the property to be searched or identify the person)* | : |
| THE CELLULAR TELEPHONES AND OTHER DEVICES | : |
| BELONGING TO ▇▇▇▇▇▇ | : |

Case No.  18-7203

**SEARCH AND SEIZURE WARRANT**

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of New Jersey *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-5

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-5

**YOU ARE COMMANDED** to execute this warrant on or before *OCT. 2, 2018*     *(not to exceed 14 days)*

☐ in the daytime, 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ the Honorable Cathy L. Waldor
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  *9/18/18   5¹⁰ PM*

Judge's signature

City and state:   Newark, New Jersey

Hon. Cathy L. Waldor, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A-5

### DEVICES TO BE SEARCHED

Any cellular telephones or electronic device (i.e., computer or storage medium) belonging to and/or in Subject 2's possession.

## ATTACHMENT B-5

Authority is sought to search the devices identified in Attachment A-5 for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371 (the "Specified Federal Offenses"), including the following, from January 2013 to the present:

a.      All Radio Frequency Monitor Boards ("RFMB")/circuit card assemblies ("CCA"), including microelectronic devices related to the production of RFMBs/CCAs;

b.      All purchase orders relating to RFMBs/CCAs;

c.      All invoices, inventory records, and product specification records for RFMBs/CCAs;

d.      All Original Equipment Manufacturer/authorized reseller documents related to RFMBs/CCAs;

e.      All shipping records, including import, delivery, and receiving records for RFMBs/CCAs;

f.      All correspondence, including e-mails, regarding RFMBs/CCAs.

g.      All quality assurance records regarding RFMBs/CCAs;

h.      All certification documents, including Certificates of Conformance for RFMBs/CCAs;

i.      All contracts and related documents regarding RFMBs/CCAs;

j.      All accounting and financial records pertaining to RFMB/CCA contracts;

k.      All records, in whatever form, of personal and business activities, including tax records, relating to the operation and ownership of the business conducted at the Subject Premises.

- 1 -

l.       Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

m.       Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

n.       Records or other items which evidence, ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2.       For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.       evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.       evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.       evidence of the lack of such malicious software;

d.       evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.       evidence of the times the COMPUTER was used;

g.       passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

- 2 -

h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.     records of or information about Internet Protocol addresses used by the COMPUTER;

j.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.     contextual information necessary to understand the evidence described in this attachment.

3.     In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

a.     any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

b.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium.

4.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

- 3 -

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

5.     During the execution of the search of the Subject 2 Devices described in Attachment A-5, law enforcement personnel are authorized to press the fingers (including thumbs) of Subject 2 to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found on Subject 1 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

AO 93 - DNJ (Rev. 3/15) Search and Seizure Warrant

# United States District Court
### for the
## District of New Jersey

In the Matter of the Search of :
*(Briefly describe the property to be searched or identify the person)* :
THE CELLULAR TELEPHONES AND OTHER DEVICES :   Case No.   18-7201
BELONGING TO ▬▬▬▬▬ :
: **SEARCH AND SEIZURE WARRANT**
:

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of New Jersey *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-3

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-3

**YOU ARE COMMANDED** to execute this warrant on or before _OCT. 2, 2018_ *(not to exceed 14 days)*

☐ in the daytime, 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____the Honorable Cathy L. Waldor_____
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   _9/18/8   5⁰⁹ pm_ 

City and state:   Newark, New Jersey                     Hon. Cathy L. Waldor, U.S. Magistrate Judge

_____                _____
                                         *Judge's signature*

                                         *Printed name and title*

## ATTACHMENT A-3

### DEVICES TO BE SEARCHED

Any cellular telephones or electronic device (i.e., computer or storage medium) belonging to and/or in Subject 1's possession.

## ATTACHMENT B-3

1.     Authority is sought to search the devices identified in Attachment A-3 for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371 (the "Specified Federal Offenses"), including the following, from January 2013 to the present:

a.     All Radio Frequency Monitor Boards ("RFMB")/circuit card assemblies ("CCA"), including microelectronic devices related to the production of RFMBs/CCAs;

b.     All purchase orders relating to RFMBs/CCAs;

c.     All invoices, inventory records, and product specification records for RFMBs/CCAs;

d.     All Original Equipment Manufacturer/authorized reseller documents related to RFMBs/CCAs;

e.     All shipping records, including import, delivery, and receiving records for RFMBs/CCAs;

f.     All correspondence, including e-mails, regarding RFMBs/CCAs.

g.     All quality assurance records regarding RFMBs/CCAs;

h.     All certification documents, including Certificates of Conformance for RFMBs/CCAs;

i.     All contracts and related documents regarding RFMBs/CCAs;

j.     All accounting and financial records pertaining to RFMB/CCA contracts;

k.     All records, in whatever form, of personal and business activities, including tax records, relating to the operation and ownership of the business conducted at the Subject Premises.

- 1 -

l.      Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

m.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

n.      Records or other items which evidence, ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

- 2 -

h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i.     records of or information about Internet Protocol addresses used by the COMPUTER;

j.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k.     contextual information necessary to understand the evidence described in this attachment.

3.     In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

a.     any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

b.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium.

4.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

5.      During the execution of the search of the Subject 1 Devices described in Attachment A-3, law enforcement personnel are authorized to press the fingers (including thumbs) of Subject 1 to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found on Subject 1 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

- 4 -

AO 93 - DNJ (Rev. 3/15) Search and Seizure Warrant

# United States District Court
### for the
## District of New Jersey

| | |
|---|---|
| In the Matter of the Search of | : |
| *(Briefly describe the property to be searched or identify the person)* | : |
| THE PERSON OF ███████████ | :     Case No.  18-7202 |
| | : |
| | :     **SEARCH AND SEIZURE WARRANT** |
| | : |

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of New Jersey *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-4

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B-4

**YOU ARE COMMANDED** to execute this warrant on or before   *OCT. 2, 2018*   *(not to exceed 14 days)*

☐ in the daytime, 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to    the Honorable Cathy L. Waldor .

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   9/18/18    5^{10} p.m.

                                      *Judge's signature*

City and state:   Newark, New Jersey        Hon. Cathy L. Waldor, U.S. Magistrate Judge

                                                   *Printed name and title*

**ATTACHMENT A-4**

**INDIVIDUAL TO BE SEARCHED**

The person of ▮▮▮▮▮▮, aged ▮▮ approximately ▮▮ in height and between approximately ▮▮ and ▮▮ pounds ("Subject 2"), including any clothing or bags in his immediate control, mobile telephones, electronic storage devices, computers and hard drives, as well as any documents.



**ATTACHMENT B-4**

Authority is sought to search Subject 2 identified in Attachment A-4 for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371 (the "Specified Federal Offenses"), including the following, from January 2013 to the present:

a. All Radio Frequency Monitor Boards ("RFMB")/circuit card assemblies ("CCA"), including microelectronic devices related to the production of RFMBs/CCAs;

b. All purchase orders relating to RFMBs/CCAs;

c. All invoices, inventory records, and product specification records for RFMBs/CCAs;

d. All Original Equipment Manufacturer/authorized reseller documents related to RFMBs/CCAs;

e. All shipping records, including import, delivery, and receiving records for RFMBs/CCAs;

f. All correspondence, including e-mails, regarding RFMBs/CCAs.

g. All quality assurance records regarding RFMBs/CCAs;

h. All certification documents, including Certificates of Conformance for RFMBs/CCAs;

i. All contracts and related documents regarding RFMBs/CCAs;

j. All accounting and financial records pertaining to RFMB/CCA contracts;

k. All records, in whatever form, of personal and business activities, including tax records, relating to the operation and ownership of the business conducted at the Subject Premises.

- 1 -

l.      Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

m.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

n.      Records or other items which evidence, ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

- 2 -

h. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

i. records of or information about Internet Protocol addresses used by the COMPUTER;

j. records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

k. contextual information necessary to understand the evidence described in this attachment.

3. In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

a. any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

b. any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium.

4. Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

- 3 -

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

5.      During the execution of the search of Subject 2 described in Attachment A-4, law enforcement personnel are authorized to press the fingers (including thumbs) of Subject 2 to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found on Subject 2 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

AO 93 - DNJ (Rev. 3/15) Search and Seizure Warrant

# United States District Court
### for the
## District of New Jersey

In the Matter of the Search of          :
*(Briefly describe the property to be searched or identify the person)*   :
THE PERSON OF ███████████           :          Case No.  18-7200
                                        :
                                        :          **SEARCH AND SEIZURE WARRANT**
                                        :
                                        :

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the District of New Jersey *(identify the person or describe the property to be searched and give its location):*

See Attachment A-2

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized):*

See Attachment B-2

**YOU ARE COMMANDED** to execute this warrant on or before    *Oct. 2 , 2018*   *(not to exceed 14 days)*

☐ in the daytime, 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to          the Honorable Cathy L. Waldor          .
                                                                                                        *(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  *9/18/18*
                        *5:07 PM*

                                                      _____
                                                                  *Judge's signature*

City and state:   Newark, New Jersey                 Hon. Cathy L. Waldor, U.S. Magistrate Judge
                 _____            _____
                                                                *Printed name and title*

## ATTACHMENT A-2

### INDIVIDUAL TO BE SEARCHED

The person of ███ █████████, aged ███ approximately ████ in height and between approximately ██ and ██ pounds ("Subject 1"), including any clothing or bags in his immediate control, mobile telephones, electronic storage devices, computers and hard drives, as well as any documents.



## ATTACHMENT B-2

1.     Authority is sought to search Subject 1 identified in Attachment A-2 for evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 38 (fraud involving aircraft parts in interstate and foreign commerce); Title 18, United States Code, Section 287 (false claims); Title 18, United States Code, Section 1343 (wire fraud); Title 18, United States Code, Section 1341 (mail fraud); Title 18, United States Code, Section 1001 (false statements); and Title 18, United States Code, Section 371 (the "Specified Federal Offenses"), including the following, from January 2013 to the present:

a.     All Radio Frequency Monitor Boards ("RFMB")/circuit card assemblies ("CCA"), including microelectronic devices related to the production of RFMBs/CCAs;

b.     All purchase orders relating to RFMBs/CCAs;

c.     All invoices, inventory records, and product specification records for RFMBs/CCAs;

d.     All Original Equipment Manufacturer/authorized reseller documents related to RFMBs/CCAs;

e.     All shipping records, including import, delivery, and receiving records for RFMBs/CCAs;

f.     All correspondence, including e-mails, regarding RFMBs/CCAs.

g.     All quality assurance records regarding RFMBs/CCAs;

h.     All certification documents, including Certificates of Conformance for RFMBs/CCAs;

i.     All contracts and related documents regarding RFMBs/CCAs;

j.     All accounting and financial records pertaining to RFMB/CCA contracts;

k.     All records, in whatever form, of personal and business activities, including tax records, relating to the operation and ownership of the business conducted at the Subject Premises.

- 1 -

l.      Records evidencing occupancy or ownership of the Subject Premises, including, but not limited to, utility and telephone bills, mail envelopes, or addressed correspondence.

m.      Computer-related documentation, meaning any written, recorded, printed, or electronically stored material that explains or illustrates the configuration or use of any seized computer hardware, software, or related items.

n.      Records or other items which evidence, ownership or use of computer equipment found in the Subject Premises, including, but not limited to, sales receipts, bills for Internet access, and handwritten notes.

2.      For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

- 2 -

       h.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

       i.     records of or information about Internet Protocol addresses used by the COMPUTER;

       j.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

       k.     contextual information necessary to understand the evidence described in this attachment.

       3.     In order to search for the items described above that may be maintained in electronic media, law enforcement personnel are authorized to search, copy, image and seize the following items for off-site review:

       a.     any computer or storage medium capable of being used to commit, further or store evidence of the Specified Federal Offenses; and

       b.     any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer or storage medium.

       4.     Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all seized information authorized by the Warrant for as long as is necessary for authentication purposes.

5.     During the execution of the search of Subject 1 described in Attachment A-2, law enforcement personnel are authorized to press the fingers (including thumbs) of Subject 1 to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found on Subject 1 for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

- 4 -

U.S. DEPARTMENT OF HOMELAND SECURITY
Special Agent in Charge / New York
Office of Investigations

## CONSENT TO SEARCH

I, ████████████████████

authorize ___SA Josph Rivera___
(Name of ICE Officers)

Officers of the Department of Homeland Security to
conduct a complete search

my ___Ossic Spass warehoust___
(Item/Place/Thing to be Searched)

scribed as ___1600 Pollith Drive___
(If Premises, Address to be Searched)

se Officers are authorized by me to take any letters,
ers, materials, or any other items/property which they
desire. The written permission is being given by me
e above Officers voluntarily, without promises or
ats being made.

████████████████████

ed Name: ████████████████████

ture: _____

Time: ___9/26/18___  ___11.00___

sed: ___Ryan Kirchens Sr, USAF___

美国国土安全部

纽约稽查处 主管稽j

搜查同意书

本人 _____
（ 姓 名 ）

兹同意 _____
（ 稽查官员姓名 ）

国土安全部稽查官履行对本人之

_____
（ 项目 / 地方 / 物品 ）

作完全的搜索。上述物品 / 物件 位于

_____
（ 搜查地地址 ）

本人授权稽查官员任意搜取任何物品/财产
以及信件，材料。本人在没有受到任何威胁
也没有得到任何承诺的情形下作出上述并
而同意书

姓名拼写： _____

签名： _____

日期 / 时间： _____

证人： _____

# EXHIBIT D



# DEFENSE LOGISTICS AGENCY
AVIATION
Procurement Operations Ogden
6051 Gum Lane. Bldg 1225
Hill AFB, UT 84056-5825

IN REPLY
REFFER TO

DLA AVIATION
PROCUMENT OPERATIONS OGDEN
ATTN: Teri Black
6051 Gum Lane, Bldg 1225
HILL AFB, UT 84056-5825

16 Oct 2018

MEMORANDUM FOR: UNITED STATES TECHNOLOGIES, INC
DBA: U.S.T.
1701 POLLITT DRIVE
FAIR LAWN NJ 07410-2814

SUBJECT: Contract SPRHA4-17-F-0034, NSN 5998-01-303-5871, Part Number 785R537G01 **First Article Approval Disapproval**

1.   The First Article submitted by you has been evaluated and is hereby disapproved.  The attached discrepancy list contains one or more critical areas that prevent use of this item.  A re-submittal will be required.

2.   Since you have failed to provide an acceptable First Article, you are in Default of this contract in accordance with the Default Clause.  Your attention is directed to FAR Clause 52.209-4, concerning disapproval.  Your response should be sent to DLA/AUA Teri Black with an information copy thereof to DCMA, within ten (10) days after receipt of this notice.  Unless we receive your written response within 10 days after receipt, the contract may be submitted for default termination.

3.   Any challenge to the validity of the disapproval should be submitted to DLA/AUA/Teri Black at 385-519-8205.  Should you desire to correct and resubmit your First Article, you should propose a new delivery schedule supported with testing costs of $1,510.72 for the disapproval fee and consideration in the amount of $250.00 for the administrative cost of the modification. No acceptance of a re-submitted First Article and Test Report will be allowed until full execution of the required modification.

4.   If you have any questions please contact Teri Black at 385-519-8205 or by e-mail to teri.black@hill.af.mil.

BLACK.TERI.L.1148
853599

Digitally signed by
BLACK.TERI.L.1148853599
Date: 2018.10.16 10:10:33 -06'00'

cc: DCMA/Springfield
DFAS-CO/North Entitlement Operations

TERI L BLACK
Contracting Officer

**809 MXSS / MXDEB**                                                    October   01, 2018

Attachment 1 Discrepancy List

Contract Number:     SPRHA4-17-F-0034
NOUN:                Monitor Circuit Card Assy
Part Number:         785R537G01
NSN:                 5998-01-303-5871

1.  Parts list 785R537 page 7 item 143 requirement is part number 5962-9312601MXX.  Certification provided for 5962-9312601MXA states date/lot code number 1440A.  Actual date/lot code number provided on the circuit card was 1128A.  The certification provided was not for the submitted component.

# EXHIBIT E



**DEFENSE LOGISTICS AGENCY**
AVIATION
Procurement Operations Ogden
6051 Gum Lane. Bldg 1225
Hill AFB, UT 84056-5825

IN REPLY
REFFER TO
DLA AVIATION                                                                    18 Oct 2018
PROCUMENT OPERATIONS OGDEN
ATTN: Teri Black
6051 Gum Lane, Bldg 1225
HILL AFB, UT 84056-5825

MEMORANDUM FOR:  UNITED STATES TECHNOLOGIES, INC
DBA: U.S.T.
1701 POLLITT DRIVE
FAIR LAWN NJ 07410-2814

SUBJECT:  Contract SPRHA4-17-F-0034, NSN 5998-01-303-5871, Part Number 785R537G01 **First Article Approval Disapproval**

1.  First Article Disapproval letter dated 16 Oct 2018 is hereby rescinded in its entirety.

2.  Due to an on-going investigation concerning this NSN/Part Number United Stated Technologies **will not be allowed** to resubmit another First Article for this NSN/Part Number.

3.   Further, since you have failed to provide an acceptable First Article, you are in Default of this contract in accordance with the Default Clause.  Your attention is directed to FAR Clause 52.209-4, concerning disapproval and at this time we are evaluating this option.

4.  If you have any questions please contact Teri Black at 385-519-8205 or by e-mail to teri.black@hill.af.mil.

BLACK.TERI.L.114    Digitally signed by
8853599              BLACK.TERI.L.1148853599
                     Date: 2018.10.18 10:00:40 -06'00'

cc:  DCMA/Springfield                              TERI L BLACK
DFAS-CO/North Entitlement Operations               Contracting Officer

# EXHIBIT F



485 Lexington Avenue, 6th Floor
New York, NY 10017

Alicia M. Morejon
Senior Claim Counsel
Bond & Specialty Insurance Claim
Phone: (917) 778-6088
Fax: (917) 778-7003
Email: AMOREJON@travelers.com

October 11, 2018

**Via Email:  lzhou@csonecapital.com**
Lili Zhou
UST Aldetec Holding Company, LLC
17-01 Pollitt Drive
Fair Lawn, NJ 07410

Re:      Insured:        UST Aldetec Holding Company, LLC
         Policy No.:     032-LB-106639043
         Matter:         In the Matter of the Search of the Premises Located at 10-01
                         Pollitt Drive, Fair Lawn, New Jersey 07410
         Claim No.:      001-DOP-X1814121-LT

Dear Ms. Zhou:

The purpose of this letter is to address the information provided to Travelers Casualty and
Surety Company of America ("Travelers" or "Company") with regard to the above
referenced matter and to follow our conversation on September 28, 2018.  As explained in
this letter, Travelers has evaluated coverage of this matter under the above referenced
Policy's Private Company Directors and Officers Liability Coverage.  Following an
analysis and review of this matter, Travelers has determined that coverage for this matter is
not available at the present time under the Policy.  Please know that we are available to
answer any questions that you might have following your review of this letter.

The Policy

Travelers issued the Policy to UST Aldetec Holding Company, LLC for the Policy Period
from December 1, 2017 to December 1, 2018.   The Insuring Agreements found in Section
I of the Policy's Private Company Directors and Officers Liability coverage section states
that the Company shall pay on behalf of the Insured Organization, Loss for Wrongful Acts
from any Claim first made during the Policy Period.

When applicable, the Company's Limit of Liability, inclusive of Defense Expenses, is
$1,000,000.00.  Defense Expenses reduce and may exhaust the Company's Limit of
Liability.  Note further that the Policy specifies a $10,000.00 retention, which applies to
Loss, including Defense Expenses.

The Matter

This preliminary evaluation is based on information provided to Travelers to date,
including the following Search and Seizure Warrants:

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **Our toll-free number is 800-842-8496**  \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please
include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                          L-08P-dow+

Travelers

October 11, 2018
Page 2

- In the Matter of the Search of the Premises Located at 18-01 Pollitt Drive, Fair Lawn, New Jersey 7410
- In the Matter of the Search of the Person of ███████████
- In the Matter of the Search of the Person of ███████████
- In the Matter of the Search of the Cellular Telephones and Other Devices Belonging to ███████████
- In the Matter of the Search of the Cellular Telephones and Other Devices Belonging to ███████████
- Consent to Search by ███████████

While it is necessary to review the allegations as they relate to coverage under the Policy, by doing so, Travelers does not wish to suggest that they have any merit.

Travelers refers to the summary of this matter as provided by Mr. Andrew Bushell provided in Ms. Nancy Peet's email of October 10, 2018.

It is reported that September 26, 2018, the United States Air Force Office of Special Investigations executed the above referenced search warrants in connection with an investigation of UST's performance under USAF Contract SPRHA4-17-D-0003.  The purpose of the contract is to establish an Indefinite Delivery/Indefinite Quantity (IDIQ) contract for the purchase of F-16 Circuit Card Assembly, NSN 5998-01-303-5871.

It is UST's understanding that the search warrants were issued with respect to the Government's investigation of issues related to the procurement of allegedly counterfeit integrated circuits.  Travelers is informed that UST does not know the genesis of the investigation but it speculates that it may be related to the seizure of integrated circuits by U.S. Customs from a supplier in China and destined for UST.

**<u>Coverage Analysis</u>**:

The Private Company Directors and Officers Liability states as follows:

> The Company will pay on behalf of:

> A.                   the Insured Persons, Loss for Wrongful Acts, except for Loss which the Insured Organization pays to or on behalf of the Insured Persons as indemnification;
> B.                   the Insured Organization, Loss for Wrongful Acts which the Insured Organization pays to or on behalf of the Insured Persons as indemnification; and
> C.                   the Insured Organization, Loss for Wrongful Acts, resulting from any Claim  first made during the Policy Period, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period.

*********************** **Our toll-free number is 800-842-8496** ***********************
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).
Rev 11/13/16                                                                                                                                                      L-08P-dow+

**Travelers**

October 11, 2018
Page 3

The Company will also pay on behalf of the Insured Organization, Investigation Expense resulting from any Security Holder Derivative Demand first made during the Policy Period, or if exercised, during the Extended Reporting Period or Run-Off Extended Reporting Period, against an Insured Organization for Wrongful Acts. The Company's maximum limit of liability for all Investigation Expense will be the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations for this Liability Coverage

Initially, Travelers directs your attention to the DEFINITIONS Section II of the Liability Coverage Terms and Conditions that define the following relevant terms:

W.    Potential Claim means any Wrongful Act that may subsequently give rise to a Claim.

Travelers now directs your attention to the DEFINITIONS Section II of the Private Company Directors and Officers Liability Coverage that defines the following relevant terms:

A.    Claim means:
  1.    a written demand, other than a Security Holder Derivative Demand, for monetary damages or non-monetary relief;
  2.    a civil proceeding commenced by service of a complaint or similar pleading;
  3.     a criminal proceeding commenced by filing of charges;
  4.    a formal administrative or regulatory proceeding, commenced by a filing of charges, formal investigative order, service of summons, or similar document;
  5.    an arbitration, mediation or similar alternative dispute resolution proceeding if the Insured is obligated to participate in such proceeding or if the Insured agrees to participate in such proceeding, with the Company's written consent, such consent not to be unreasonably withheld;A. Claim means an Employment Claim or, if ITEM 5 of the Declarations indicates that Third Party Claim Coverage is applicable, a Third Party Claim. A Claim is deemed to be made on the earliest date that any Executive Officer first receives written notice of such Claim. However, if any Insured Person who is not an Executive Officer first receives written notice of a Claim during the Policy Period, but no Executive

*********************** **Our toll-free number is 800-842-8496**  ***********************
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).
Rev 11/13/16                                                                                                                                L-08P-dow+

**Travelers**

October 11, 2018
Page 4

           Officer receives written notice of such Claim until after the Policy Period has expired, then such Claim will be deemed to have been made on the date such Insured Person first received written notice of the Claim.

6.     a Security Holder Derivative Demand solely with respect to Investigation Expenses and subject to the Investigation Expense Limit of Liability set forth in ITEM 5 of the Declarations;

7.     the service of a subpoena on an Insured Person identified by name if served upon such person pursuant to a formal administrative or regulatory proceeding, or

8.     a written request to toll or waive a statute of limitations relating to a potential civil or administrative proceeding;

against an Insured for a Wrongful Act, provided that Claim does not include any labor or grievance arbitration or other proceeding pursuant to a collective bargaining agreement.

A Claim is deemed to be made on the earliest date that any Executive Officer first receives written notice of such Claim. However, if any Insured Person who is not an Executive Officer first receives written notice of a Claim during the Policy Period, but no Executive Officer receives written notice of such Claim until after the Policy Period has expired, then such Claim will be deemed to have been made on the date such Insured Person first received written notice of the Claim.

\* \* \*

M.     Wrongful Act means:

1.     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an Insured Person in his or her capacity as such;

2.     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, an Insured Person in his or her Outside Position;

3.     any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty or neglect by, or any matter asserted against, the Insured Organization; or

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* **Our toll-free number is 800-842-8496** \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                    L-08P-dow+

**Travelers**

October 11, 2018
Page 5

4.      any matter asserted against an Insured Person solely by
        reason of his or her status as such.

All Related Wrongful Acts are a single Wrongful Act for purposes
of this Liability Coverage, and all Related Wrongful Acts will be
deemed to have occurred at the time the first of such Related
Wrongful Acts occurred whether prior to or during the Policy
Period.

According to the information provided, this matter does not constitute a Potential Claim or
Claim for a Wrongful Act against an Insured within the meaning of the Policy.  As of this
time, this matter is limited to an investigation and a Wrongful Act, as that term is defined
by the Policy, has not been made against UST Aldetec Holding Company, LLC.  The
Search and Seizure Warrants do not assert an actual or alleged act, error, omission,
misstatement, misleading statement of breach of duty or negligent by, or any matter
asserted against  UST Aldetec Holding Company, LLC, the Insured under the Policy.  On
this basis, the Policy's Insuring Agreement is not triggered. Moreover, the Policy's
definition of the term Potential Claim is not met at this time either in the absence of a
Wrongful Act.   Based upon the foregoing, Travelers will not take any action at this time
and it will not defend or indemnify UST Aldetec Holding Company, LLC in this matter.

Travelers understands that UST Aldetec Holding Company, LLC wishes to have this
matter reviewed for consideration of the application of the Policy's Investigation Expense
Limits of Liability.

As noted above Travelers will pay on behalf of the Insured Organization, Investigation
Expenses, however it must arise out of a Security Holder Derivative Demand first made
during the Policy Period, or if exercised, during the Extended Reporting Period or Run-Off
Extended Reporting Period, against an Insured Organization for Wrongful Acts. The
Policy defines a Security Holder Derivative Demand to mean a "written demand by one or
more security holders of the Insured Organization in their capacity(ies) as such to bring a
civil proceeding in a court of law on behalf of, or in the name or right of, the Insured
Organization against any Insured Person for a Wrongful Act by an Insured Person…" This
matter does not qualify as a Security Holder Derivative Demand as that term is defined by
the Policy and, therefore, would not trigger the application of the Policy's Investigation
Expense limits of $100,000.00.

Next we address the Crucial Event Management Coverage Endorsement which provides a
Crucial Event Management Limit of Liability of $25,000 for all Crucial Management Loss,
which amount is part or, and not in addition to, the Liability Coverage Limit of Liability.
The Endorsement states in relevant part as follows:

The following is added to section II. INSURING AGREEMENTS of the
Liability Coverage:

*********************  Our toll-free number is 800-842-8496  *********************
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please
include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                                        L-08P-dow+

Travelers

October 11, 2018
Page 6

CRUCIAL EVENT MANAGEMENT COVERAGE

The Company will pay, on behalf of the Insured Organization, Crucial Event Management Loss for any Crucial Event Management Matter first occurring during the Policy Period.

The Endorsement defines the term Crucial Event Management Matter as:

1.  the death, incapacity or criminal indictment of any Insured Person on whom the Insured Organization maintains key person life insurance;

2.  a public announcement of the recall of a major product of the Insured Organization;

3.  a public announcement or accusation that the Insured Organization has caused the bodily injury, sickness, disease, death or emotional distress of a group of persons, or damage to or destruction of any tangible real estate, including the loss of use thereof;

4.  a public announcement of employee layoffs in excess of 0% of the Insured Organization's total number of employees;

5.  a public announcement that the Insured Organization has defaulted or intends to default on its debt;

6.  a public announcement that the Insured Organization intends to file for bankruptcy protection or that a third party is seeking to file for involuntary bankruptcy on behalf of the Insured Organization, or that bankruptcy proceedings are imminent, whether voluntary or involuntary; or

7.  a public announcement that governmental or regulatory proceedings are beginning or may begin against the Insured Organization;

A Crucial Event Management Matter will first begin when an Executive Officer becomes aware of the matter, and will conclude when the Crucial Event Management Firm advises the Insured Organization that such matter no longer exists or when the Crucial Event Management Limit of Liability set forth in ITEM 5 of the Declarations is exhausted.

* * *

Travelers has reviewed this matter under the Crucial Event Management Coverage Endorsement and it does not find that any of the above quoted categories apply to this situation.  In the absence of a Crucial Event Management Matter, the Crucial Event Management Coverage Endorsement will not apply to this matter.

In the event there is any development or further communication with regard to this matter, please forward such information to us and it can be re-evaluated under the Policy.

As Travelers views the foregoing as dispositive of coverage for this matter at this time, it has not raised other Policy terms, conditions, limitations or exclusions that may further

*********************  Our toll-free number is 800-842-8496  *********************
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                                          L-08P-dow+

**Travelers**

October 11, 2018
Page 7

limit or exclude coverage for this matter, including whether the individuals who were the subject of the Warrants are Insureds under the Policy.

Travelers' attention to this matter is subject to a full and complete reservation of all rights, remedies and defenses under the Policy or otherwise including but not limited to the right to raise other Policy terms and conditions as defenses to coverage in the future as appropriate.  Neither this letter, nor any actions by Travelers or any of its agents shall constitute or be deemed a waiver of any right or defense available to Travelers under the Policy or applicable law.

Please do not hesitate to contact me if you have any questions or comments.


Sincerely,


Alicia M. Morejon

cc:     Andrew Bushell  - **Via Email:  abushell@cstonecapital.com**

        Nancy Peet – **Via Email:  npeet@whconnolly.com**

        Michael Schulman  - **Via Email: mschulman@whconnolly.com**

        Amy Anest  - **Via Email:  aanest@whconnolly.com**

        Tom Coticchio – **Via Email:  tcoticchio@whconnolly.com**

        Annmarie Hattersley  - **Via Email:  ahattersley@whconnolly.com**

        Liam Russell – **Via Email:  LRUSSEL1@travelers.com**


*********************  **Our toll-free number is 800-842-8496**  *********************
If possible, please send future communications and documents concerning this claim via email to AMOREJON@travelers.com Please include the claim number in the subject line. (Please note that in certain cases we may still request original documents).

Rev 11/13/16                                                                                                                L-08P-dow+